

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |
|---|---|
| § | No. 08-18-00144-CV |
| IN THE INTEREST OF M.L.L., § | Appeal from |
| A CHILD § | 143rd District Court |
| § | of Ward County, Texas |
| § | (TC # 17-04-24193-CVW) |
| § | |

# O P I N I O N

This appeal is from a judgment terminating the parental rights of Appellant, G.N.R., to her son, M.L.L.  We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

On April 3, 2017, the Texas Department of Family and Protective Services received a neglectful supervision report pertaining to M.L.L. (Mark) and his mother, G.N.R. (Mother).[1] The intake indicated that Mark, who was thirteen years of age, had missed a significant amount of school and was small for his age.  The report also reflected that Mother might have a mental disorder and was using methamphetamine.  Mother had been seen hiding underneath the trailer of her boyfriend, "Rob."  The CPS investigator assigned to the case, Susana Carrasco, knew

---

[1] To protect the identity of M.L.L., the opinion will refer to various individuals by either initials or an alias.  *See* TEX.R.APP.P. 9.8.  M.L.L. will be referred to by the alias "Mark," G.N.R. will be referred to as "Mother," Mother's boyfriend will be referred to as "Rob," and M.L.L.'s foster mother, L.D., will be referred to as "Laney."

from a prior intake report in 2016 that there had been domestic violence between Mother and Rob, and Mother was not supposed to be living with him.

Carrasco spoke with Mother as part of her investigation. Mother denied living underneath Rob's trailer, but said she and Mark were living with Rob. Mother and Mark had moved frequently, and they had also been living with two of Mother's other boyfriends. Mother admitted that there had been domestic violence in the past but claimed that her relationship with Rob had improved. Carrasco later learned that the Police Department had gone to the trailer twenty-three times between January 1, 2017 and April 1, 2017 on calls related to Mother and Rob. Additionally, the police were dispatched to the home on April 30, 2017 because Mother and Rob were fighting.

Carrasco's investigation also showed that Mother had failed to obtain medical treatment for Mark to treat undescended testicles, a serious medical condition. Consequently, on April 20, 2017, the Department filed a petition for protection of a child, for conservatorship, and for termination of Mother's parental rights.[2] Following a hearing on May 25, 2017, the trial court signed an order appointing the Department as the temporary managing conservator and placing Mark with L.D. (Laney).[3]

On April 26, 2018, an associate judge heard the case and determined that Mother's parental rights should be terminated. Mother exercised her right to a *de novo* hearing. The Department filed a written request for the District Court to consider the entire record of the

---

[2] The petition also sought the termination of the parental rights of S.L., the alleged biological father. S.L.'s parental rights were summarily terminated pursuant to Section 161.002(b)(1) of the Family Code. *See* TEX.FAM.CODE ANN. § 161.002(b)(1). S.L. did not appeal.

[3] Mark was not present at the hearing on May 25, 2017 because Mother's sister had taken him to New Mexico. Following a hearing, the trial court held Mother in contempt and ordered her confined in jail for 180 days. The contempt order provided that Mother could purge her contempt by turning Mark over to Child Protective Services. On June 27, 2017, the trial court ordered Mother released from jail because Mark had been turned over to Child Protective Services.

hearing conducted before the associate judge on April 26, 2018. *See* TEX.FAM.CODE ANN. § 201.015(c)("The referring court may also consider the record from the hearing before the associate judge."). The District Court considered the prior record but also heard evidence at the hearings conducted on July 24, 2018 and July 27, 2018.

The evidence at trial showed that Mark was exposed to significant domestic violence in Rob's home and at the hands of Mother. In 2016, Mother was arrested for assaulting Rob, but Mother was more typically the victim of these incidents. Mother testified that Rob had broken her nose and tailbone, and he had broken her arm twice. Rob punched Mother and kicked her while wearing steel-toe boots. Mother also claimed that Rob had cut her throat. Rob struck Mother with the butt of a shotgun on one occasion and the gun went off striking the front door. Mark was seated next to her when this happened. In a separate incident, Mother and Mark were in a car when Rob fired a shotgun and broke out the car windows.[4] According to Mother, they often had to leave Rob's home and Mark missed school because of the domestic violence incidents. Mother also claimed that she had attempted to leave Rob several times, but he would force her to return to his home.

Mark confided to Teresa Valero, a licensed professional counselor, that he had seen Rob hit Mother and he was afraid of both of them. Mark also told Valero that the violence between Mother and Rob was "ongoing" and was "just how they lived." Mark's exposure to domestic violence was not limited to being an onlooker. Mark told Valero that Mother, who he described as being quick to anger, would grab him by the back of his neck with both hands and throw him into his bedroom while calling him a "crybaby" and "little bitch." Mark was sometimes unable to articulate his feelings about Mother during the counseling sessions because he was so afraid of

---

[4] Mother contradicted this testimony by claiming that Rob broke the windshield with a rock and broke the car windows with his fist.

her. He told Valero that he does not want to be around Mother at all and he believes that if he returns to Mother she will hurt him again. Valero testified that Mark is "very afraid of [Mother]" and he does not have any attachment to her. Valero observed that Mark had improved significantly and continued to thrive with his foster family, and he repeatedly told Valero that he wanted to stay with them. Valero recommended that Mother's parental rights be terminated to prevent further harm to Mark and to allow him to thrive in his current placement.

The trial court also heard evidence that Mother had failed to obtain medical care for Mark to address a serious medical condition which required surgery. In 2014, Amanda Darling, a nurse practitioner, discovered during a routine physical examination that Mark had undescended testicles. Mother was present in the room during the examination and Darling informed Mother about her findings. Darling explained that the testes were inside of the abdomen and would be damaged if Mark did not receive treatment. She also explained to Mother that the condition had to be treated or Mark would not have the testosterone necessary for puberty and masculine development. Darling gave Mother a referral to Dr. Wiehle, a urologist in Odessa, who determined that the testes were located inside of the inguinal canal and recommended surgery to correct the condition. According to Darling, surgery is the only effective treatment for Mark's condition. Mother did not follow through with the recommended surgery, and she later told Darling that she did not want to take Mark back to Dr. Wiehle. Consequently, the Clinic referred Mother to a children's hospital in the Fort Worth area to address Mark's condition, but Mother did not take him. The clinic made a second referral for Mark in 2016, but Mother did not keep the appointment. Mother later picked up Mark's records because she did not want to return to the clinic. As a result, the clinic made a report of medical neglect to Child Protective Services. The surgery was finally done on July 7, 2017 after Mother turned over Mark to Child Protective

Services.  Mark's testosterone levels are still extremely low, but he is receiving hormone therapy.  In Darling's opinion, it was medical neglect for Mark to not have the surgery performed when it was first recommended in 2014.

The District Court found that the Department had proven by clear and convincing evidence that Mother had:  (1) knowingly placed or knowingly allowed Mark to remain in conditions or surroundings which endangered the physical or emotional well-being of the child (Section 161.001 (b)(l)(D), Texas Family Code); and (2) engaged in conduct or knowingly placed Mark with persons who engaged in conduct which endangered the physical or emotional well-being of the child (Section 161.00l(b)(l)(E), Texas Family Code).  The court also found by clear and convincing evidence that termination of Mother's parental rights was in Mark's best interest.  The court appointed the Department as the permanent managing conservator of the child.

### TERMINATION GROUNDS AND BEST INTEREST
### UNDER SECTION 161.001

Mother raises three issues challenging the legal and factual sufficiency of the evidence supporting the trial court's findings.  In Issues One and Two, Mother argues that the evidence is legally and factually insufficient to support the predicate termination grounds found by the trial court under Section 161.001(b)(1)(D) and (E).  In Issue Three, she challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under Section 161.001(b)(2).

Parental rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code.  *See* TEX.FAM.CODE ANN. § 161.001.  Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of

the children.  *See id*.  Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In the Interest of A.B.B.*, 482 S.W.3d 135, 138 (Tex.App.--El Paso 2015, pet. dism'd w.o.j.).  Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.  *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).  We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights as well as the finding of best interest.  *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.).

*Standards of Review*

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.O.A.,* 283 S.W.3d 336, 344 (Tex. 2009).  We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so.  *In the Interest of J.P.B.*, 180 S.W.3d at 573.  We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts.  *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

- 6 -

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenge findings. *See In re J.F.C.*, 96 S.W.3d at 266. We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### Section 161.001(b)(1)(D)

In Issue One, Mother challenges the legal and factual sufficiency of the evidence supporting the termination of her parental rights under Section 161.001(b)(1)(D). A parent's rights may be terminated if there is clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(D). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex.App.--Texarkana 2003, no pet). In this context, the child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex.App.--Houston [14th Dist.] 2014, pet. denied). Physical violence in the home leads to an unstable and unpredictable environment for children. *See In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex.App.--Amarillo Jan. 2, 2019, no pet.)(mem. opn.). A parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under

subsection (b)(1)(D).  *See In re M.V.*, 343 S.W.3d 543, 547 (Tex.App.--Dallas 2011, no pet.)(evidence of domestic violence between mother and father was sufficient to establish that mother knowingly placed or knowingly allowed child to remain in conditions or surroundings which endangered his physical or emotional well-being and that mother engaged in conduct or knowingly placed child with the father who engaged in conduct which endangered child's physical or emotional well-being, thus supporting termination of mother's parental rights).

A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.  *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex.App.--Houston [14th Dist.] 2017, no pet.).  The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed.  *Ybarra v. Texas Department of Human Services*, 869 S.W.2d 574, 577 (Tex.App.--Corpus Christi 1993, no pet.).  When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm.  *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577.  Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment.  *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist.] 2005, no pet.).

The evidence at trial showed that Mother caused Mark to live in an endangering environment.  First, Mother chose to live in a home with Rob where domestic violence is a routine part of life.  Mark testified that the violence between his Mother and Rob was "just how they lived."  Because of the violence, Mother and Mark frequently had to flee the home and live with other people.  Further, Mark missed a significant amount of school.  There is also evidence that Mother physically and emotionally abused Mark.  Mark suffered trauma from the abuse and became so afraid of Mother that he had difficulty expressing his feelings about her during

counseling. Mark's counselor testified that he was extremely afraid of both Rob and Mother. Mark's home life was also unstable because Mother has been incarcerated several times. Mother was incarcerated in 2016 for assaulting Rob, and she was arrested on a drug charge in December 2017 although she testified that she has not been indicted on the charge. Mother was also arrested for a terroristic threat during a violent incident with Rob. The trial court held Mother in contempt during the pendency of this case and she spent one month in jail before purging the contempt. Mother testified that while she was in jail on the contempt charge, the court also revoked her probation on a trespassing conviction and she remained in jail until July 4, 2017.

Mother argues that there is evidence she was not mentally stable on the day of removal, and therefore, she was incapable of willfully, consciously, and intentionally placing Mark in a dangerous environment. There is evidence in the record that Mother was erratic and confrontational when approached by law enforcement officers during the 2016 domestic violence incident. The Department referred Mother for mental health treatment with MHMR in 2016. Mother received mental health treatment, but she told Carrasco that she had discontinued treatment. Mother testified that she was diagnosed with "P.T.S.E. (sic)", and she was prescribed Zoloft and two other medications, but her mental health care provider took her off the medications after only a short time. Mother also claimed that she attended a few one-on-one counseling sessions but did not require further counseling. The Department presented evidence that the service plan required individual counseling for Mother, but she failed to attend any of the sessions scheduled with Tom Duckworth. When examining the evidence of endangerment in a sufficiency evaluation, our review is not restricted to the day Mark was removed from the home. Mother had been involved with Rob for several years and they regularly engaged in domestic violence in Mark's presence. There is nothing in the record to support an inference that Mother

was mentally incapable of perceiving the danger presented by the home environment. Further, Mother admitted during her testimony that she had been unable to provide a safe and stable home for Mark, that she had cause Mark to be around a dangerous person, and her volatile relationship with Rob had endangered Mark's physical and emotional well-being.

After considering the evidence in the light most favorable to the trial court's finding, we conclude the evidence is legally sufficient to support the court's finding that Mother knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. *See In re M.V.*, 343 S.W.3d at 547 (evidence of domestic violence between mother and father was sufficient to establish that mother knowingly placed or knowingly allowed child to remain in conditions or surroundings which endangered his physical or emotional well-being thereby supporting termination of mother's parental rights). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was justified under Section 161.001(1)(D). Issue One is overruled.

*Section 161.001(b)(1)(E)*

In Issue Two, Mother challenges the legal and factual sufficiency of the evidence supporting the termination of her parental rights under Section 161.001(b)(1)(E). The trial court found by clear and convincing evidence that Mother engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the physical or emotional well-being of the child. The term "conduct," as used in Section 161.001(b)(1)(E), includes both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex.App.--San Antonio 2000, pet. denied). To "endanger" means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Texas Department of Human Services v. Boyd*, 727 S.W.2d

531, 533 (Tex. 1987); *In re A.L.*, 545 S.W.3d 138, 146 (Tex.App.--El Paso 2017, no pet.); *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.). Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *See A.S. v. Texas Department of Family and Protective Services*, 394 S.W.3d 703, 712 (Tex.App.--El Paso 2012, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex.App.--Fort Worth 2009, no pet.). Neglect can be just as dangerous to the well-being of a child as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re A.L.*, 545 S.W.3d at 146; *Castaneda v. Texas Department of Protective and Regulatory Services*, 148 S.W.3d 509, 522 (Tex.App.--El Paso 2004, pet. denied).

Under Section 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.--Fort Worth 2003, no pet.). Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* When determining whether a parent has engaged in an endangering course of conduct, a fact finder may consider the parent's actions and inactions that occurred both before and after the child was born. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex.App.--El Paso 2015, no pet.); *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex.App.--El Paso 2012, no pet.). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236

- 11 -

(Tex.App.--Houston [14th Dist.] 2003, pet. denied). Domestic violence, lack of self-control, and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex.App.--Houston [14th Dist.] 2003, no pet.).

The evidence at trial showed that Mother and her boyfriend Rob frequently engage in domestic violence in Mark's presence. Mother has also been physically violent with Mark and abused him emotionally. Mark expressed to his counselor that he is afraid of both Rob and his mother. In addition to exposing Mark to a violent, unsafe, and unstable home life, Mother failed to address Mark's serious medical condition. Mother knew that Mark needed surgery to address his medical condition, but she failed to follow medical advice or take him to the appointments. Mother's behavior in this regard was not a single, isolated incident but constituted a deliberate and conscious course of conduct spanning three years. The surgery that Mark required was done shortly after he was turned over to CPS by Mother.

Mother argues that the evidence is insufficient to prove that she engaged in a voluntary and deliberate course of endangering conduct because she was not mentally stable on the day Mark was removed. The evidence is not limited to Mother's acts and omissions on the day Mark was removed from the home. Mother and Mark had lived with Rob off-and-on for several years. Mother admitted during her testimony that she had caused Mark to be around a dangerous person, and her volatile relationship with Rob had endangered Mark's physical and emotional well-being. The evidence demonstrates that Mother engaged in a voluntary, deliberate, and conscious course of action, and she was aware of the potential for danger but disregarded it.

We find that the evidence, when considered in the light most favorable to the trial court's finding, is legally sufficient to support termination of Mother's parental rights under Section 161.001(b)(1)(E) of the Family Code. *See In re E.R.W.*, 528 S.W.3d at 264-65 (evidence of

domestic violence supported finding under Section 161.001(b)(1)(e)); *In re M.V.*, 343 S.W.3d at 547 (evidence of domestic violence between mother and father was sufficient to establish that mother engaged in conduct or knowingly placed child with the father who engaged in conduct which endangered child's physical or emotional well-being, thus supporting termination of mother's parental rights). After viewing the entire record, we also conclude that the evidence is factually sufficient to support the challenged finding. Issue Two is overruled.

*Best Interest - Legal Sufficiency*

In Issue Three, Mother challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under Section 161.001(b)(2) of the Family Code. A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of B.C.S.*, 479 S.W.3d 918, 927 (Tex.App.--El Paso 2015, no pet.); *In the Interest of R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re B.C.S.*, 479 S.W.3d at 927. Several factors must be considered in our analysis of the best interest issue: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927.

We begin by examining the legal sufficiency of the evidence supporting the best interest finding. The first factor is the desires of the child. Mark was fifteen years of age at the time of trial. According to his counselor, Teresa Valero, Mark has no attachment to Mother and he repeatedly indicated that he wishes to stay with his foster family. Mark also told Sharlotte Wright, the conservatorship specialist assigned to the case, that he wants to be adopted by his foster family and does not want to return to Mother. Further, Mark spoke with Mother during a break in the court proceedings and asked her to voluntarily relinquish her parental rights, but she refused. This factor weighs heavily in favor of the best interest finding.

The next two factors are the child's emotional and physical needs now and in the future, and the emotional and physical danger to the child now and in the future. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Edwards v. Texas Department of Protective & Regulatory Services*, 946 S.W.2d 130, 138 (Tex.App.--El Paso 1997, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *In re U.P.,* 105 S.W.3d 222, 230 (Tex.App.--Houston [14th Dist.] 2003, pet. denied)(stating that children need permanency and security). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re D.L.N.*, 958 S.W.2d 934, 934 (Tex.App.--Waco 1997, pet. denied). As determined in our review of Issues One and Two, the evidence at trial established that Mother knowingly placed or knowingly allowed Mark to remain in an endangering environment, and she engaged in conduct which endangered Mark's physical and emotional well-being. Mother exposed Mark to an unstable home life by living with Rob. Mother and Mark frequently had to flee from Rob's home due to domestic violence and Mark missed a significant amount of school as a result. Teresa Valero determined that Mark had suffered from trauma and he expressed his

fear to her that Mother would harm him if he returned to her. Valero recommended that Mother's parental rights be terminated so that Mark could continue to live with his foster family. Based on the evidence, the trial court could have determined that the second and third factors weigh heavily in support of the best interest finding.

The fourth factor is the parenting abilities of the individuals seeking custody. In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children. *D.O. v. Texas Department of Human Services*, 851 S.W.2d 351, 356 (Tex.App.--Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002). Adequate parent skills may be demonstrated by a parent's actions in providing children with a safe physical home environment free from exposure to violence. *See Holley*, 544 S.W.2d at 371-72. In contrast, a parent's conduct which exposes a child to violence may be considered when determining whether the parent has demonstrated appropriate parenting abilities. *See In re H.D.*, No. 01-12-00007-CV, 2013 WL 1928799, at *14 (Tex.App.--Houston [1st Dist.] May 9, 2013, no pet.). There is significant evidence that Mother endangered Mark by physically and emotionally abusing him and by exposing him to a violent and unstable home environment. Additionally, Mother refused to take Mark for surgery needed to address a serious medical condition. This factor weighs in favor of the best interest findings.

The fifth factor examines the programs available to assist those individuals to promote the child's best interest. Various programs were available to provide assistance to Mother, but she failed to take advantage of them. Mother failed to attend her individual counseling with Tom Duckworth and failed to repeat domestic violence counseling with Safe Place as requested. The trial court could infer from Mother's failure to take the initiative to utilize the available programs

- 15 -

that she would not have the ability to motivate herself in the future. *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex.App.--Fort Worth 2003, no pet.). This factor supports the court's best interest finding.

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the child by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. The fact finder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. Mark is thriving in his foster home placement as evidence by his improved grades and participation in extracurricular activities includes tennis and band. Laney testified that the family's goal is to adopt Mark. Both Laney and her husband work and have sufficient income to provide for their children and Mark.

Mother testified that she is sober and can provide a safe home for Mark. Mother is employed and stated she can provide Mark's necessities, including food and clothing. Mother also testified that she is no longer involved with Rob. Mother did not address Mark's ongoing medical needs. After comparing Mother's plan with that of the Department and foster family, the trial court could have reasonably found that the Department's plan is more realistic and allowing Mark to remain with the foster family offers him the permanency and stability he would not have with Mother. The sixth and seventh factors weigh in favor of the best interest finding.

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. The evidence established that Mother endangered Mark's physical and emotional well-being by physically and emotionally abusing him, and subjecting him to an unsafe, violent, and unstable home environment. Based on this evidence, the trial court could have found that the existing parent-child relationship is not a proper one.

The ninth factor is whether there is any excuse for the parent's acts or omissions. Mother asserts that she has a long history of domestic violence and depression, and that her involvement with the Department arose out of that depression. Mother was certainly the victim of domestic violence at the hands of her boyfriend, Rob, but the focus in determining best interest is necessarily on Mark. Mother suggested at trial that she attempted to leave Rob, but he would find her and take her back to his trailer. Mother does not explain why she did not seek help in leaving Rob. Mother also suggests that she is not responsible for her conduct because it was the product of mental illness. Mother does not point to any evidence in the record supporting this aspect of her argument. *See* TEX.R.APP.P. 38.1(i). While there is evidence that Mother's behavior was sometimes described as erratic and she was referred for a mental health assessment, she testified that her mental health care provider had taken her off of all medications and had ceased the counseling sessions. We have examined the entire record and do not find any evidence that would excuse Mother from responsibility for her conduct. The ninth factor supports the best interest finding.

Having reviewed all of the *Holley* factors, we conclude that the evidence is both legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Mother's parental rights is in Mark's best interest. Issue Three is overruled.

### CONSERVATORSHIP DETERMINATION

In her final issue, Mother argues that the trial court erred by appointing the Department as the permanent managing conservator of the child. Mother's challenge to the appointment of the Department as permanent managing conservator is subsumed into the appeal of the overall termination order. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008). Section 161.207 of the Family Code provides: "If the court terminates the parent-child relationship with respect to both

parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX.FAM.CODE ANN. § 161.207(a). After terminating the parental rights of Mother, the alleged biological father, and any unknown father, and the rental rights, the trial court appointed the Department as the sole managing conservator of Mark. Issue Four is overruled. Having overruled each issue, the *de novo* order terminating Mother's parental rights to Mark is affirmed.

February 8, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.