# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00531-CV

---

### V. P. a/k/a M. Y., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 18-0093-CPSC1, THE HONORABLE SUZANNE BROOKS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

V.P. a/k/a M.Y. (Mother) appeals from the trial court's order terminating her parental rights to her children, who at the time of trial were ages six and seven. On appeal, Mother asserts that the evidence is legally and factually insufficient to support the jury's finding that one or more statutory grounds for termination exist. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). Mother also contends that the evidence is factually insufficient to support the jury's finding that termination of her parental rights is in the children's best interest. *Id.* § 161.001(b)(2). For the reasons that follow, we will affirm the trial court's order.

### BACKGROUND

On May 17, 2018, Officer Randall Johnson of the Cedar Park Police Department responded to a request for police presence at an apartment complex in Cedar Park, Texas. The requestor, later identified as Mother, was moving with her children, two daughters, out of an

apartment that they shared with A.Y., the children's other parent. Upon Officer Johnson's arrival, Mother reported to him that A.Y. had a history of domestic abuse and that she was concerned that her leaving might cause A.Y. to become violent. Consequently, Officer Johnson stood in the apartment living room while Mother gathered her things and then escorted her and the children to the main office building of the apartment complex, where Mother had arranged for her mother (the children's maternal grandmother) to pick them up.

After observing the condition of the apartment and the behavior of the children, Officer Johnson became concerned for the children's welfare. According to his testimony at trial, Officer Johnson noticed that, except for a blow-up mattress in the living room, there was no furniture in the two-bedroom apartment, child-like drawings were on all of the walls, and sex toys were visible in the apartment. One of the bedrooms contained computer equipment in the middle of the room. In the other bedroom, Officer Johnson found a small closet with a video camera set up and blankets on the floor. Officer Johnson noticed that there was a strong odor of urine in the closet, feces on the closet walls, and two water bowls and crackers on the closet floor (although the parents denied having any pets). After observing the children, Officer Johnson became concerned that the children, who were four and six, were unable to speak and appeared malnourished for their ages. Officer Johnson contacted Child Protective Services (CPS) and the Cedar Park Police Department's criminal investigations division to report his observations.

After receiving Officer Johnson's report, the Texas Department of Family and Protective Services (the Department) removed the children from the parents' care. Erin Larsen, the CPS caseworker assigned to the case, met the children two weeks after the removal and observed that they had poor boundaries, were unable to follow directions, spoke in an unintelligible manner, and, instead, had developed their own language for communicating with

2

each other.  The Department put the parents on service plans and placed the children with a foster family.

A.Y. later voluntarily relinquished her parental rights, and the Department's case to terminate Mother's parental rights proceeded to a jury trial in July 2019, more than a year after the children's removal.  The Department's witnesses included Mother, A.Y., Officer Johnson, and caseworker Larsen.  At the conclusion of the trial, the jury was asked in a broad-form question whether Mother's parental rights should be terminated based on at least one of three statutory grounds for termination—section 161.001(b)(D), (E), or (O) of the Texas Family Code—and whether termination was in the best interest of the children.  In accordance with the jury's verdict, the trial court signed a final order terminating Mother's parental rights.  Mother timely appealed.

In four issues, Mother challenges the sufficiency of the evidence supporting the jury's finding that one or more statutory grounds for termination exist, along with the jury's finding as to best interest.

**STANDARD OF REVIEW**

"While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).  To terminate the parent-child relationship, the party seeking termination must prove by clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interest.  Tex. Fam. Code § 161.001(b)(1), (2); *see In re C.H.*, 89 S.W.3d at 23.  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex.

3

Fam. Code § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018).

In reviewing the sufficiency of the evidence in parental-termination cases, we apply a standard of review on appeal that reflects this heightened standard of proof, *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002), focusing on whether the evidence is such that a reasonable factfinder could form a firm belief or conviction, *In re C.H.*, 89 S.W.3d at 26 ("A standard [of review] that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role."). In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630.

In conducting a legal-sufficiency review, a reviewing court "cannot ignore undisputed evidence contrary to the finding," but must otherwise look at the evidence in the light most favorable to the judgment, which means the court must "assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630-31; *In re J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.,* 96 S.W.3d at 266. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the finding and considering undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *J.F.C.,* 96 S.W.3d at 266.

A factual-sufficiency review, in contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding."

*Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## ANALYSIS

**Statutory-predicate finding**

In three issues, Mother challenges all three alleged statutory grounds for termination, any one of which could support the jury's finding that one or more statutory grounds for termination exist. *See Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.) ("When multiple statutory grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if any of the statutory grounds alleged supports the finding."). In issues one and two, Mother asserts that the evidence is legally and factually insufficient to support a finding that termination is warranted under either subsection (D) or subsection (E)—in other words, a finding that Mother knowingly placed or allowed the children to remain in an endangering environment or a finding that Mother engaged in endangering conduct. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). In her third issue, Mother challenges the legal and factual sufficiency of the evidence to support a finding that termination is warranted pursuant to subsection (O), which authorizes termination when a parent fails to comply with a "court order that specifically established the actions necessary for the parent to obtain return of the child." *See id.* § 161.001(b)(1)(O).

An appellate court may affirm a termination judgment by upholding one termination ground under Section 161.001(b)(1), so long as there is also a finding that termination

5

is in the child's best interest, even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). However, the Texas Supreme Court recently held that due process requires appellate courts to review challenged subsection (D) and subsection (E) findings to ensure that the evidence is sufficient to support at least one of those grounds even when the trial court made another finding that is sufficient to uphold the judgment. *In re N.G.*, 577 S.W.3d at 237; *see A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 698-99 n.2 (Tex. App.—Austin 2019, pet. denied). This is because an endangerment finding under either subsection (D) or (E) could be used in future proceedings to terminate a parent's rights to other children. *See* Tex. Fam. Code § 161.001(b)(1)(M) ("The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)."). Consequently, we will begin our review by determining whether the evidence is sufficient to support an endangerment finding under subsection (D) or (E).

Under subsection (D), the trial court may order termination of the parent-child relationship if it finds that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(D). Subsection (E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(E). Both subsections require proof of endangerment, i.e., exposing a child to loss or injury, or jeopardizing a child's emotional

6

or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endangerment means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it does not require that the "conduct be directed at the child or that the child actually suffers injury." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Moreover, "[e]ndangerment does not need to be established as an independent proposition but may be inferred from the parental misconduct." *A.C.*, 577 S.W.3d at 699 (citing *Boyd*, 727 S.W.2d at 533).

The focus under subsection (D) is on the child's environment and whether the environment itself causes the child's physical or emotional well-being to be endangered. *In re M.C.*, 352 S.W.3d 563, 566 (Tex. App.—Dallas 2011, no pet.). The term "environment" in subsection (D) refers not just to the suitability of the child's living conditions, but also to the environment produced by the conduct of the parents or others in the home. *In re M.L.L.*, 573 S.W.3d 353, 361 (Tex. App.—El Paso 2019, no pet.) (citing *In re S.R.*, 452 S.W.3d at 360). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth, 2009, no pet.); *see In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re M.L.L.*, 573 S.W.3d at 361; *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("[A]busive or violent conduct by a parent . . . can produce an environment that endangers the physical and emotional well-being of a child . . . .") (quoting *D.O. v. Texas Dep't of Human Servs.*, 851 S.W. 2d 351, 354 (Tex. App.—Austin 1993, no writ)). As a result, a parent's failure to remove herself and her children from a

7

physically violent or abusive relationship may support a finding of endangerment under subsection (D). *In re M.L.L.* 573 S.W.3d at 361; *In re I.G.*, 383 S.W.3d at 770.

With respect to subsection (E), the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in "a voluntary, deliberate, and conscious course of conduct" that endangered the child's physical or emotional well-being. Tex. Fam. Code § 161.001(b)(1)(E); *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re M.L.L.*, 573 S.W.3d at 363-64. In determining whether a parent engaged in an endangering course of conduct, the factfinder may consider the parent's actions and inactions that occurred before and after the child was born. *In re M.L.L.*, 573 S.W.3d at 364. A factfinder may infer that a parent's lack of contact with her child and absence from the child's life endangers the child's emotional well-being. *In re M.D.M.*, 579 S.W.3d at 765. "Neglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.L.L.*, 573 S.W.3d at 363. When the evidence pertaining to both subsections (D) and (E) is interrelated, as it is here, we may consolidate our review of the record. *See In re M.R.J.M.*, 280 S.W.3d at 503; *see also V.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00889-CV, 2018 Tex. App. LEXIS 4592, at *29 (Tex. App.—Austin June 22, 2018, pet. denied) (mem. op.).

The undisputed evidence establishes that Mother began living with A.Y. in 2010, when she was eighteen years old. Mother testified that she met A.Y., who was twenty-three years old, at church and that she decided to live with A.Y. to escape from an abusive boyfriend. The couple initially lived in A.Y.'s parents' home, then in an extended-stay hotel, and later in an apartment in Round Rock. That same year, after the couple became homeless, Mother broke up with A.Y. and moved back with her mother. According to Mother, A.Y. began to harass and

threaten her mother and, eventually, set fire to a field next to her mother's property. Nevertheless, Mother and A.Y. immediately resumed their relationship when A.Y. was released from jail for setting the fire. In 2011, the couple moved to Houston, then to Ohio, and finally to Austin, where they again became homeless.

Mother became pregnant with the couple's first child in 2011. Both Mother and A.Y. were unable to maintain any steady employment in Austin, and the couple initially planned to put their child up for adoption. As a result, Mother was financially supported by the adoption agency during most of her pregnancy; however, a week before the child's birth, Mother notified the adoption agency that she had changed her mind about the adoption. Shortly after the child's birth, the family moved to Waco, where they lived in an extended-stay hotel and then "off the grid," meaning they rented a "place in the back of a house" from a man who did not require a credit check. According to Mother, A.Y. was employed in a technical-support position, and Mother stayed home to care for the child.

When Mother became pregnant with their second child in 2012, the family moved to Washington. Until 2017, the couple lived in Tacoma, Washington, first in an extended-stay hotel, then a studio apartment, and later a two-bedroom apartment. A.Y. worked from home in a technical-support job, and Mother took care of the children. Mother told the jury that her daily activities included feeding the children, playing with them, and teaching them the alphabet.

In 2018, the family moved to California and rented an apartment in Anaheim. During this time, A.Y. began an "online pornography business," live streaming sexual videos. Mother told the jury that A.Y. was alone in most of the videos, that she was in the videos with A.Y. only a "handful of times," and that the live streaming occurred in their one-bedroom apartment while the children were at home but in a different room. Mother denied that the

9

children were ever in any of the videos or that they ever saw any sexual activity, explaining that she was with the children most of the day in the bedroom as A.Y. live streamed pornography from the other room. Approximately four months after moving to California, the family became homeless and began living in their car. They returned to Texas and, after a brief time living with A.Y.'s father, moved into the apartment in Cedar Park.

At trial, Mother testified extensively about the alleged physical and emotional abuse inflicted on her by A.Y. According to Mother, A.Y. would suffocate her with a pillow, "grab [her] and throw [her] against walls . . . and onto the floor," and cause her to suffer scratches and bruises. Mother told the jury that the children had witnessed A.Y.'s physical abuse against her "since they were babies" and that A.Y. was also "harsh and mean" with them, often telling them to "shut up" when they would cry. Mother denied having ever been physically abusive to A.Y. and stated that she only used physical force, such as scratching and biting, when necessary to protect herself.

Mother also told the jury that A.Y. was controlling and that she was afraid to leave or to inform anyone of the abuse. For example, A.Y. did not allow Mother to take the children to the park or to see a doctor or dentist. Instead, A.Y. prevented Mother from attending to the children; prohibited her from having a cell phone until 2017, although at some point, she had access to a computer and the internet; and kept her from seeing her family. In addition, Mother told the jury that A.Y. made her and the children smoke marijuana from a vape pen because A.Y. believed it was medicinal. Finally, Mother testified that California child protective services interviewed her, but she did not tell the caseworker about the abuse because she was "scared of the consequences" and that she did not seek help earlier because she did not know about shelters

10

to help abused women and children. Instead, Mother just tried to "be as normal as possible in the abnormal situation," and she and the children "were trained to keep [A.Y.] calm."

Mother also described A.Y. as a "sex addict." In addition to the online-pornography business, A.Y. made Mother work as a waitress in a strip club and later forced her into human sex trafficking. Mother described for the jury incidences where A.Y. would take her to the houses of strangers to engage in sexual activity for money. Mother acknowledged that the children were left at home alone when A.Y. would take her to these "appointments." Mother also testified A.Y. would pinch the children and then try to conceal this from her and that A.Y. engaged in conduct with the children that she described as "sexual things." Specifically, Mother told the jury that A.Y. would "grab them forcefully and try to make them suck [her] boob" and that A.Y. would pinch their "boobs." According to Mother, A.Y. was controlling and abusive throughout their relationship and this behavior continued until she left in May 2018. Mother told the jury that she has suffered from post-traumatic stress disorder (PTSD) as a result of A.Y.'s abuse.

With regard to the children's physical condition, Mother denied that they were malnourished when they were removed by the Department but testified that "we all needed proper nutrition and to get stronger." Mother also denied that the children were delayed in their speech and language development, explaining that they were just afraid to speak because of the trauma and abuse, and she denied that the children did not know their names, arguing that they have multiple nicknames and just did not understand the question when asked their names by investigators. In addition, Mother testified that she wanted to enroll the oldest child in public school in Cedar Park, but "there was just too much physical abuse" and that consequently, A.Y. called and canceled her appointment with the school. Similarly, Mother stated that she wanted to

take her oldest child to the doctor to get medical help for her lazy eye, but A.Y. would not let her because she "did not believe in doctors."

As to the living conditions in which the children were found, Mother testified that she and the children slept on the floor with blankets and that if there was urine and feces in the house, it was only because they were regressing from their potty training as a result of the abuse and stress. She explained that the cameras found in the closet were used by A.Y. to monitor her and the children. In addition, Mother admitted that she and A.Y. regularly left the children alone and that she had not talked to any of her therapists about the effects of this isolation on the children. According to Mother, her attorney had instructed her not to talk about those issues with her therapists due to her pending criminal case.[1] Similarly, Mother testified that her attorney advised her not to meet with her caseworker without him present. Finally, Mother told the jury that she felt that her parental rights should not be terminated because she was trying her best to protect her children and "finally got away from a situation that was scary."

A.Y. was the only other witness to testify about the couple's relationship and the dynamics of the household. In her testimony, A.Y. did not deny that the children lived in an abusive household but denied being the abuser. A.Y. told the jury that Mother was physically abusive during most of their relationship and that Mother suffered from emotional issues and mood swings, often "randomly" screaming in the presence of the children. A.Y. testified that Mother was "controlling, possessive, very limiting," so much that she would monitor A.Y. instead of caring for the children and that she would not let A.Y. leave the house alone. A.Y. denied that she was emotionally, physically, or sexually abusive and told the jury that Mother did

---

[1] At the time of trial, Mother was under a first-degree felony indictment for injury to a child, punishable by five to ninety-nine years' confinement, based on the conditions in which the children were found. *See* Tex. Penal Code § 22.04(e).

not take care of the children, who were by themselves "eighty to eighty-five percent" of the time. In fact, A.Y. claimed that she was the children's primary caretaker and that Mother did not change the children's diapers and often prevented A.Y. from feeding them. During the day the children were left in "padlocked onesies" or pajamas to prevent them from taking off their clothes after soiling themselves. A.Y. conceded that the children did not go outside to play and rarely saw a doctor. A.Y. admitted to making sexually explicit videos, which she claimed was Mother's idea, and to having sex in the same room as the children. A.Y. denied that she ever forced Mother to work at a strip club or to participate in the live-streaming-pornography business.

The jury also heard from Dr. Marion Forbes, who had examined the children after their removal. Dr. Forbes told the jury that the children appeared to be "externally sort of normal, healthy children" but were developmentally delayed in several areas. Dr. Forbes pointed out, for example, that the children "did not know their numbers or colors," "initially did not know their names," and "had virtually no intelligible language." Dr. Forbes told the jury that the children, then ages four and six, should have known at least 2,000 words but instead only knew about twenty words. Finally, Dr. Forbes told the jury that she did not see any "organic reason" for the developmental delay exhibited by the children, such as autism, and that the cause for the delay was likely profound "emotional neglect."

On appeal, Mother argues that the jury could not have reasonably believed A.Y.'s testimony that Mother was the sole abuser in the relationship and the cause of the children's trauma. In addition, although not raised as a separate issue on appeal, Mother argues that the trial court erred in failing to allow her to present a witness—specifically, A.Y.'s previous wife—who would have testified that A.Y. had been abusive to her during their marriage. In

13

Mother's view, this witness's testimony would have shown that A.Y. was lying about not being physically or sexually abusive. In her brief, Mother states, "If that testimony had come in, a reasonable factfinder may not have found that [Mother] endangered her children, in the absence of all evidence."

What Mother does not explain, however, is why a jury could not have reasonably believed that she failed to promptly remove the children from a dangerous environment—even if, as she contends, A.Y. was the lone abuser and solely responsible for creating that violent environment. The undisputed evidence established that from the time they were born until they were removed by the Department, the children lived in an abusive and violent household—both parents testified to this fact. Moreover, both parents acknowledged that the abuse occurred in the presence of the children and that the abuse negatively impacted the children's well-being. The jury also heard testimony from both parents suggesting that the children were neglected by being left alone for long periods of time and by not receiving proper medical care, although they each blamed the other for allowing that neglect. Finally, although Mother contends that she was fearful to remove herself and her children from the household before May 2018, a jury could have reasonably believed that Mother had sufficient opportunity to leave sooner or to seek help but did not.

After considering all the evidence in the light most favorable to the jury's finding, along with any undisputed evidence contrary to the finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D); *see In re A.C.*, 560 S.W.3d at 631. Similarly, a reasonable factfinder could have formed a firm belief or

14

conviction that Mother engaged in conduct which endangered her children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Furthermore, in view of the entire record, we conclude that the disputed evidence contrary to the jury's finding is not so significant as to prevent the jury from forming a firm belief or conviction that termination was warranted under subsection (D) and under subsection (E). *See In re A.C.*, 560 S.W.3d at 631. Therefore, the evidence was legally and factually sufficient to support the jury's finding that one or more statutory grounds for termination exists. Accordingly, we overrule Mother's first and second issues on appeal.

Because we have determined that sufficient evidence supports the jury's finding based on one or more of the alleged statutory grounds, we need not address Mother's third issue on appeal, arguing that the evidence is insufficient to support termination under subsection (O). *See* Tex. R. App. P. 47.1.

**Best-Interest Finding**

Next, we consider Mother's argument that the evidence is factually insufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2). "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id.* § 263.307(a). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine whether termination is in a child's best interest, we review the entire record, *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013), and consider the non-exclusive factors set out in *Holley v. Adams*: (1) the children's wishes; (2) the children's present and future emotional and physical needs; (3) any emotional and physical danger to the children, now and in the future; (4) the

15

parental abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the children; (6) the plans for the children by the individual or agency seeking custody; (7) the stability of the proposed home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code § 263.307 (listing factors court should consider in determining whether child's parents are "willing and able to provide the child with a safe environment"). The absence of evidence on some of these factors, however, does not preclude a finding that termination is in a child's best interest "particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27.

***Mother's parental abilities; Mother's plans for the children; and emotional and physical danger to the children, now and in the future***

Proof concerning the statutory predicate under section 161.001(b)(1) does not relieve the Department of proving that termination is in the best interest of the children, but "the same evidence may be probative of both issues." *Id.* at 28. Moreover, in evaluating a parent's fitness for providing for a child, a factfinder may measure a parent's future conduct by her past conduct. *In re M.D.M.*, 579 S.W.3d at 770. As previously outlined, the jury heard evidence from which it could have reasonably concluded that Mother had knowingly allowed her children to remain in an environment that could, and did in fact, cause injury to their emotional and physical well-being—the children having been impacted by years of living in a neglectful and abusive household.

In addition, the jury heard evidence from which it could assess Mother's ability to parent and provide a stable home in the future, including the likelihood that she would place or

16

allow her children to remain in a similarly dangerous environment in the future. In part, the Department presented the testimony of Dr. Matthew Ferrara, a psychologist who conducted a psychosexual evaluation of Mother at the Department's request, and his report was admitted into evidence. *See* Tex. Fam. Code § 263.307(b)(6) (listing as factor "results of psychiatric, psychological, or developmental evaluations of . . . the child's parents"). Dr. Ferrara told the jury that his evaluation included, as a preliminary matter, testing Mother's ability to be forthcoming in therapy and that she received the maximum score on that test, meaning that she tended to portray herself in "an overly virtuous manner" and was not forthcoming. Dr. Ferrara also testified that Mother showed signs of borderline-personality disorder and that Mother would need at least a year of therapy, specifically Dialectical-Behavior Therapy (DBT) or a similar protocol, to manage the symptoms.

The jury also heard from Dr. Melissa Siebert, a psychologist who conducted an evaluation of Mother. *See id.* Dr. Siebert testified that in response to her questions, Mother would "kind of avoid going into the root of the reality of what was going on or what kind of emotional state she was in." Dr. Siebert explained that she administered a personality test on Mother and that "she scored very high on positive impression management, meaning that she scored so high that it's unlikely that the results were an accurate reflection of her personality functioning which means she was highly defensive in her responding." To Dr. Siebert, this indicated that Mother "isn't ready to get into what's going on with them and really try to treat or fix those symptoms." Dr. Siebert also testified that she eventually diagnosed Mother with borderline-personality disorder and that Mother should be treated through consistent DBT. Dr. Siebert also told the jury that a parent with untreated borderline-personality disorder "can have a difficult time meeting their children's needs" and that "they have such dis-regulation that it can become very difficult

17

for them to really focus on their children and give them the kind of nurturance that they need." Finally, Dr. Siebert testified that she has treated many domestic violence victims, that most victims are capable "of acknowledging the role they played in endangering their children," and that whether they have made that acknowledgment "would be important in trying to assess whether they should regain custody."

The jury heard testimony from caseworker Larsen about Mother's progress and cooperation during the fourteen months following the removal of her children. The Department created a service plan for Mother, and Mother completed a parenting class and a psychological evaluation, as required by her plan. Mother also received individual therapy from three therapists, even though she was in jail for six of the last fourteen months. However, Larsen testified that Mother refused to address parenting issues with her therapists. Larsen explained to the jury that the Department eventually found a therapist for Mother who "could focus on individual therapy as well as incorporating domestic violence," but nothing in Mother's therapy notes suggests that she has ever identified her role in the abuse or neglect of her daughters. In addition, Mother never received DBT, or any other borderline-personality-disorder treatment, as recommended in her psychological evaluation. Larsen told the jury that the Department expects parents who are the victims of domestic abuse to complete services so that they do not repeat the cycle and that, in this case, Mother was unwilling to work with the Department. Larsen testified that Mother often refused to speak with her, which prevented her from assessing Mother's ability to provide a safe and stable home. *See id.* § 263.307(b)(10) (listing as factor for court "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision"). In Larsen's view, Mother has a pattern of being with abusive partners, has never identified her own role in

18

the abuse or neglect of her children, and therefore, represents an emotional and physical danger to the children.

The jury also heard testimony about Mother's ability to provide a stable home for the children. The undisputed evidence established that the children would continue to require therapeutic services and specialized educational accommodations in the future. At the time of trial, however, Mother did not have a car or a driver's license. Mother told the jury that she has a support system through her church and that they have professionals who would help with the children's speech and educational needs. Mother acknowledged that she does not have a job or other source of income. Mother testified that she worked at a sandwich shop for two months but left because she was being sexually abused there. At the time of trial, Mother was living with her mother but told the jury that if the children were returned to her, she planned to live with them in a two-bedroom apartment at Key2Free. According to Mother, Key2Free is an organization that helps victims of human trafficking, and the organization had offered to give her free housing for a year.

### Desires of the children and stability of proposed placement

The jury heard testimony from multiple witnesses concerning the children's physical and emotional improvement while in foster care and the care they have received from their foster parents. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 Tex. App. LEXIS 1445, at *8 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). While parental rights may not be terminated merely because a child might be better off living somewhere else, *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—

19

Fort Worth 2001, no pet.), a factfinder may consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that could result if termination were not ordered, *see D.O.*, 851 S.W.2d at 358; *see also* Tex. Fam. Code § 263.404. Moreover, evidence that a child is well cared for by a foster family or a proposed placement and has spent minimal time in the presence of the child's parent is relevant to the best-interest determination and, specifically, is relevant to the child's desires. *In re M.D.M.*, 579 S.W.3d at 770.

Here, the jury heard evidence that when the children first arrived in foster care, they did not speak an understandable language, did not seem to know their names, appeared unbathed and unkept, and would scream when the foster parents attempted to bathe them. The foster parents have since worked with the children to develop basic hygiene skills, such as teeth brushing and hair brushing. The foster parents also have worked with public school officials to ensure that the children are placed in classrooms that meet their educational needs. The children have received occupational therapy and speech therapy, in and outside of school, and their language and speech has improved. The oldest child had surgery to correct her lazy eye, received dental work for crowns and fillings, and is beginning to read and recognize words. Similarly, while the youngest child initially had behavioral issues at school, her behavior has improved and she has made progress at school. In addition, the youngest child is now receiving physical therapy to address some stability issues. Larsen testified that when the children were first placed in foster care they did not have "any type of emotional regulation or typical behaviors for a child" but are now learning coping skills and engaging with their foster family.

Finally, the undisputed evidence shows that the children enjoy interacting with their foster parents and with their foster parents' children and are excited to see their foster

20

parents after being apart, even for short periods of time. Larsen testified that while the children are unable to comprehend or expressly communicate their wishes as to placement, neither child has indicated any kind of homesickness or desire to see their parents, and it "would be devastating" to remove the children from their foster home. Multiple witnesses also testified that the children have bonded with their foster parents and foster siblings, and the children's foster father told the jury that he and his wife love the children and plan to adopt them.

We conclude that, considering the entire record and weighing disputed evidence contrary to the jury's finding against all the evidence favoring the finding, the jury could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). Because the evidence is factually sufficient to support the jury's best-interest finding, we overrule Mother's fourth issue on appeal.

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: February 4, 2020