# NO. 12-20-00251-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN RE:* | § | |
| *VANESSA ARP,* | § | *ORIGINAL PROCEEDING* |
| *RELATOR* | § | |

## *MEMORANDUM OPINION*

Vanessa Arp, acting pro se, filed this original proceeding to challenge Respondent's temporary orders and denial of her motions to dismiss and for placement change.[1] We deny the writ.

## BACKGROUND

On January 22, 2020, the Texas Department of Family and Protective Services (the Department) filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship regarding H.A. and W.A.[2] Vanessa and Carl Arp are the children's parents. Kelsey Drennan, a Department representative, stated in her supporting affidavit that on September 1, 2019, the Department received an intake for concern of neglectful supervision based on an allegation that Carl engaged in domestic violence with Vanessa in front of H.A. H.A. told Drennan that Carl pushed Vanessa's arm through a window and her arm bled like a shark bite.

Vanessa told Drennan that Carl had been out of the home since April but showed up unannounced on the day in question. Vanessa told him to leave and he pushed her arm through the window. She mentioned other instances when she awoke to him in her bedroom, when he stole her car keys and later slapped her, and when he drove through the garage door after

---

[1] Respondent is the Honorable Tim Womack, Judge of the 307th District Court in Gregg County, Texas. The Texas Department of Family and Protective Services and Carl Arp are the Real Parties in Interest.

[2] As of a hearing on September 30, 2020, H.A. was six years old and W.A. was three years old.

becoming angry. On another occasion, Carl broke into the house, drug Vanessa to the car, and began driving. Vanessa escaped through an unlocked car door. Vanessa told Drennan that Carl has four pending charges for assaulting her and she believed that Carl uses drugs. She did not allow him to see the children when he was using drugs. Vanessa also claimed that Carl has been emotionally abusive, she is better off without him, and she cannot risk placing the children in jeopardy. Vanessa denied taking any medications at the time; she was previously prescribed Adderall for ADHD but stopped taking the medication. Drennan helped Vanessa schedule an appointment with the Women's Center of East Texas to seek a protective order.

On October 12, the Department received another intake stating that Vanessa used methamphetamine in the home and in the children's presence. The intake alleged that Carl found Vanessa passed out next to a pipe, and that Vanessa threatened to crash the car with the children inside and has threatened to leave the children outside alone. When Drennan went to the home to look for the family, she observed a vehicle outside the home but no one answered when she knocked on the door. On October 15, Drennan spoke to Detective Brandon Heath with the Longview Police Department who stated that they have many cases on the Arps but Vanessa would not respond to their attempts to follow up.

When Drennan spoke to Vanessa, Vanessa cried and said that the vehicle Drennan saw outside the home on October 12 belonged to Carl, who was not supposed to be there. Vanessa claimed to be afraid of him. She described receiving several calls from an unknown number and when she finally answered, the person identified as a detective and wanted to know her whereabouts. Vanessa also believed that Carl broke into her house and stole her dentures, and hacked into her social media and telephone because she had not received Drennan's calls from the weekend. Because Carl called her to ask about the new intake, she believed he was monitoring her electronic activity. Although Vanessa agreed to take a drug test, she never responded to Drennan's subsequent calls and texts. When Drennan spoke to Carl, he denied assaulting Vanessa. He believed his ex-wife made the new intake because she and Vanessa were "bickering." He had no concerns about drug use by Vanessa and he denied using drugs.

On November 15, Drennan learned that Vanessa's home caught fire, the fire may have been intentionally set, and Vanessa had been home with the children. Vanessa did not answer when Drennan attempted to call. On November 19, Vanessa's attorney told Drennan that he filed a divorce proceeding, with a restraining order and a protective order. Drennan asked that

2

Vanessa be drug tested in order to close the case if the domestic violence issue would be handled through the divorce proceedings.

On December 3, Drennan spoke to Detective Heath who stated that he received several more reports since the last time they spoke. He advised that Vanessa went to Carl's job, threw rocks at Carl's vehicle, and was held until officers arrived. On December 9, Drennan received police reports from the Longview Police Department. One report stated that Vanessa, her children, and her father went by the home to retrieve mail and a prescription when she noticed that someone was inside the home. She went inside and found Carl, who immediately assaulted her. Carl, however, reported that Vanessa entered the home and hit him with a light. When officers went to check the mailbox, they found a pipe commonly used to smoke methamphetamine, 1.1 grams of methamphetamine, and four loose white oval pills. Neither Carl nor Vanessa claimed the drugs.

Drennan also went to the hotel where the Arps stayed after the fire. The staff told Drennan that Vanessa checked into the hotel with her children and a man, who the staff identified as Carl from a photograph. The staff stated that they called the police almost daily because of disturbances between Carl and Vanessa. In one instance, Carl blocked the driveway with his vehicle and the couple was arguing.

Drennan stated that Vanessa continues contact with Carl while telling authorities that she is afraid. She expressed a major concern for drug use as methamphetamine was found in the location that Vanessa said she would be retrieving items. Drennan stated, "The children are highly vulnerable ages and cannot self-protect in the event another incident of domestic violence occurs while they are present."

On January 22, Respondent signed an order for protection of the child. On February 18, Respondent held a full adversary hearing at which Vanessa did not appear, and Respondent found her to be in default for purposes of the hearing.[3] On March 3, Respondent signed a temporary order, in which he found sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the children's physical health or safety which was

---

[3] At the 14-day adversary hearing on January 29, 2020, Respondent ordered Vanessa to return for a hearing on February 3. On February 3, Vanessa informed Respondent that she obtained funds to retain counsel. Respondent relieved Vanessa's court-appointed counsel and rescheduled the hearing for February 18. He stated on the record that there would be no written notice. Vanessa expressed her understanding that the hearing had been reset for February 18. Respondent informed her that the hearing would occur whether or not she had retained counsel.

3

caused by an act or failure to act of the person entitled to possession; (2) it is contrary to the children's welfare to remain in the Arp home; (3) the urgent need for protection required the children's immediate removal and reasonable efforts consistent with the circumstances and providing for the children's safety were made to eliminate or prevent removal; and (4) reasonable efforts have been made to enable the children to return home but there is a substantial risk of a continuing danger if they are returned to the Arp home. Respondent further found that it is in the children's best interest to limit Vanessa's rights and duties and it is not in the children's best interest that either parent be appointed managing conservator because such appointment would significantly impair the children's physical health or emotional development. The children had been placed with a relative or other designated caregiver and Respondent concluded that the placement is appropriate and in the children's best interest. Respondent ordered that Vanessa have no possession or access to the children until further order of the court.

Vanessa subsequently filed a motion to dismiss for fraud on the court and motions for placement change. After hearings on each motion, Respondent denied the motions. This proceeding followed.[4]

## PREREQUISITES TO MANDAMUS

Mandamus is an extraordinary remedy. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). A writ of mandamus will issue only when the relator has no adequate remedy by appeal and the trial court committed a clear abuse of discretion. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding). The relator has the burden of establishing both of these prerequisites. *In re Fitzgerald*, 429 S.W.3d 886, 891 (Tex. App.—Tyler 2014, orig. proceeding.). "Mandamus will not issue when the law provides another plain, adequate, and complete remedy." *In re Tex. Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 613 (Tex. 2006) (orig. proceeding).

## TEMPORARY ORDER

Vanessa contends that Respondent abused his discretion by entering the March 3 temporary order and failing to return the children to her after the February 18 adversary hearing.

---

[4] At the adversary hearing on January 29, Carl agreed to the Department being named temporary managing conservator. He is not a relator in this proceeding and has not filed a mandamus petition challenging Respondent's March 3 order. Thus, we will address Respondent's rulings as they apply to Vanessa only.

**Delay in Filing Mandamus**

We begin by addressing the Department's contention that Vanessa waived any right to relief by waiting approximately eight months after the March order to file her mandamus petition.

Mandamus is an extraordinary remedy, not an absolute right. *See **Rivercenter Assocs. v. Rivera**,* 858 S.W.2d 366, 367 (Tex. 1993). "[I]ts issuance is largely controlled by equitable principles." *Id*. "One such principle is that 'equity aids the diligent and not those who slumber on their rights.'" *Id*. (quoting **Callahan v. Giles**, 137 Tex. 571, 576, 155 S.W.2d 793, 795 (1941)). "Thus, delaying the filing of a petition for mandamus relief may waive the right to mandamus unless the relator can justify the delay." **In re Int'l Profit Assocs., Inc.**, 274 S.W.3d 672, 676 (Tex. 2009) (orig. proceeding). To invoke this equitable doctrine of laches, the movant "ordinarily must show an unreasonable delay by the opposing party in asserting [its] rights, and also the moving party's good faith and detrimental change in position because of the delay." **In re Laibe Corp.**, 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (per curiam).

Here, Vanessa did not file her petition for writ of mandamus with this Court until November 4, 2020, just over eight months from Respondent's March 3 order.[5] In response to the Department's argument asserting delay, Vanessa points to the "mandatory 'shut down'" due to the COVID-19 pandemic. Although the pandemic began during the months preceding the filing of this original proceeding, this Court remained open to accept filings. Thus, the pandemic would not have prevented Vanessa from pursuing mandamus relief at an earlier date. Vanessa further states that the delay is attributable to gathering documents, including the Department's objections to disclosure of such documents, in order to pursue her motions and claims of fraud against the Department. She states that she scheduled hearings on her motions for the earliest possible dates. This explanation is at least reasonable. Even without any explanation, however, the Department does not assert any good faith and detrimental change in position because of the delay.

Most importantly, the child's best interest shall always be our primary consideration in determining issues of conservatorship, possession of, and access to the child. TEX. FAM. CODE ANN. § 153.002 (West 2014); *see **Messier v. Messier**,* 389 S.W.3d 904, 907 (Tex. App.—

---

[5] The record indicates that the final hearing was scheduled for December 8, 2020. However, the case information listed on the Gregg County website reflects that trial has been rescheduled for March 2021.

Houston [14th Dist.] 2012, no pet.) (noting that best interests of child are paramount concern in custody cases). Courts regularly grant mandamus relief in the sensitive context of child custody proceedings because appeal is frequently inadequate to protect the rights of parents and children. *Proffer v. Yates*, 734 S.W.2d 671, 673 (Tex. 1987); *In re Reiter*, 404 S.W.3d 607, 611 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding). "Lawsuits involving child-custody determinations touch on parents' constitutional interests and important issues affecting children's welfare." *Reiter*, 404 S.W.3d at 611. Given the weight to which we must give the best interests of the child, we conclude that Vanessa's delay in seeking mandamus relief does not preclude review under the circumstances of this case. *See In re Bird*, No. 12-18-00291-CV, 2019 WL 210829, at *3 (Tex. App.—Tyler Jan. 16, 2019, orig. proceeding) (mem. op.).

**Applicable Law**

A trial court abuses its discretion when it makes a decision that is so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *In re M-I L.L.C.*, 505 S.W.3d 569, 574 (Tex. 2016) (orig. proceeding). We will not substitute our judgment for that of the trial court but must consider whether the trial court acted without reference to guiding rules and principles. *Id*. A trial court has no discretion in determining what the law is or applying the law to the facts. *Id*. A clear failure by the trial court to correctly analyze or apply the law constitutes an abuse of discretion. *Id*.

At the conclusion of the full adversary hearing in a suit affecting the parent child relationship filed by the Department, the court shall order the return of the child to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:

> (1) there was a danger to the physical health or safety of the child … which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child;
>
> (2) the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal; and
>
> (3) reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home.

6

TEX. FAM. CODE ANN. § 262.201(g) (West Supp. 2020). "[I]f the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child, the court shall issue an appropriate temporary order under Chapter 105." *Id*. § 262.201(h). In determining whether there is a continuing danger to the child's physical health or safety, the court may consider whether the household to which the child would be returned includes a person who: (1) abused or neglected another child in a manner that caused serious injury to or the death of the other child; or (2) sexually abused another child. *Id*. § 262.201(i).

"To limit the profound detrimental consequences that can result from unjustified emergency removal, the Legislature mandated that a full adversary hearing be held shortly after an emergency removal, so children who are not endangered can be returned to their loved ones as promptly as possible." *In re C.T.*, 491 S.W.3d 323, 326-27 (Tex. 2016) (Guzman, J., dissenting). "Unless the evidence demonstrates the existence of each requirement set forth in section 262.201(g), the trial court is required to return the child to the parents' custody pending litigation." *In re K.L.M.*, No. 14-19-00713-CV, 2019 WL 6001170, at *4 (Tex. App.—Houston [14th Dist.] Nov. 14, 2019, orig. proceeding) (mem. op.) (per curiam).

The "Department and the trial court retain authority to address subsequent conduct by Mother and Father as appropriate." *In re M.N.M.*, 524 S.W.3d 396, 405 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding). The Family Code gives the district court broad authority to protect children short of separating them from their parents and this likewise includes a range of mechanisms to address a parent's controlled substance abuse. *In re Tex. Dept. of Family & Protective Servs.*, 255 S.W.3d 613, 615 (Tex. 2008); *M.N.M.*, 524 S.W.3d at 405; *K.L.M.*, 2019 WL 6001170, at *4; *see* TEX. FAM. CODE ANN. § 105.001(a) (West 2019). This includes counseling, regular drug testing, completion of drug assessments, attendance at Narcotics Anonymous meetings, and entry of a service plan requiring that the parent not associate or communicate with individuals who engage in self-destructive behavior or illegal drug use, among other conditions. *See In re T.C.H.,* No. 06-16-00054-CV, 2016 WL 7175291, at *3 (Tex. App.—Texarkana Dec. 8, 2016, no pet.) (mem. op.); *see also In Interest of D.L.D.*, No. 01-15-00160-CV, 2015 WL 4496708, at *2 (Tex. App.—Houston [1st Dist.] July 23, 2015, pet. denied) (mem. op.); *In re J.N.A.*, No. 04-14-00825-CV, 2015 WL 1393272, at *2-3 (Tex. App.—San Antonio Mar. 25, 2015, no pet.) (mem. op.); *In re P.D.*, No. 06-14-00052-CV, 2014 WL

5465872, at *4 (Tex. App.—Texarkana Oct. 29, 2014, no pet.) (mem. op.). Thus, a trial court need not return the children to their parent or parents without granting other appropriate relief to protect the children. *See **Tex. Dept. of Family & Protective Servs.***, 255 S.W.3d at 615 (denying Department mandamus relief, but noting that while trial court must vacate current temporary orders as directed by appellate court – for Department's failure to satisfy Section 261.201 – trial court need not do so without granting other appropriate relief to protect children).

A temporary order following an adversary hearing is reviewable through a petition for a writ of mandamus. *See **K.L.M.***, 2019 WL 6001170, at *2; ***M.N.M.***, 524 S.W.3d at 398-99.

**Testimony at February Hearing**

At the February 18 hearing, Longview Police Office Jeffrey Timmons testified that he first encountered Vanessa on November 12, 2019, when responding to a call regarding a disturbance or assault at the Arp home. Vanessa appeared to be excited, talkative, and energetic. She claimed that Carl was inside the house and was not supposed to be there, as there had been a fire and the family was staying at a hotel. She explained that she went by the house to fetch the mail because she was expecting a prescription to arrive that day. Both Carl and Vanessa alleged having been assaulted by the other. Carl claimed to be inside the home for remodeling purposes when Vanessa appeared and struck him with a work light. Vanessa had not contacted police before entering the home to confront Carl. Timmons testified that an extensive domestic violence history existed between Carl and Vanessa. Timmons also checked the mailbox and discovered some clear plastic baggies, including one that contained what he believed to be crystal methamphetamine, a glass pipe, and some loose pills. At that point, Vanessa was not as talkative and appeared ready to leave the scene. Timmons also noticed several sores on Vanessa's face along her jawline that in his experience were common among methamphetamine users. He believed that Vanessa commented on how long she previously used methamphetamine, but he could not recall what she said without re-watching the video. Timmons listed Carl and Vanessa both as suspects and as victims. He stated that the children were outside in the car with who he believed was Vanessa's father.

Longview Police Officer R.L. Davis was called to the Wingate Motel on January 22, 2020, to assist the Department because Vanessa would not open the door to allow the children's removal. Longview Police Officer Syndi Howell testified that Vanessa claimed she shut the door on the Department so she could put on a shirt. Howell described Vanessa as "very erratic,

running around back and forth," closing drawers, and "running around throwing things, clothes, not really picking anything up, not really putting anything away. Just kind of just throwing things around, not really making any sense of what she was looking for or doing." Vanessa also had a cellphone that was recording. Davis described Vanessa as disheveled and the motel room as chaotic, with bottles of children's Tylenol on the counter and clothing, toys, and other belongings scattered in the room. The officers found Carl inside the motel room's locked bathroom. Carl claimed he was there visiting the children and had been there a few hours. Howell believed Carl had possibly been there longer, as he had clothes, a toothbrush, and toothpaste with him, and phone chargers were located on both sides of the bed.

During the removal, H.A. struck Drennan and said, "You deserve that." Vanessa did not correct this behavior. H.A. also said, "My mom is innocent. You're being mean." But Howell testified that H.A. also asked the officers for a sticker. Howell explained that this request could be a concern if H.A. knew, because of numerous dealings with police, that police carry stickers. W.A. was calm initially but eventually became upset. According to Howell, H.A. wanted to stay with Carl. Although Carl was the subject of a protective order, Davis testified that Vanessa did not appear concerned about the protective order or any violence against her or the children. When Carl was arrested, Vanessa attempted to claim the protective order was no longer valid and that she had dropped the protective order.

Drennan testified that there had been a series of intakes involving the Arps. A September 1, 2019, intake alleged that Carl pushed Vanessa, her arm went through the window, and H.A. was present during this incident. H.A. told Drennan that Carl brought food to the house, Carl pushed Vanessa, whose arm went through a window, and Vanessa's arm looked like a "shark bite." When Drennan met with Vanessa, they discussed the long history of domestic violence between Carl and Vanessa, that they were separated, and that Carl was not supposed to be coming to the home. On the day of the incident, Vanessa did not want Carl at the house and was trying to get him to leave; they were arguing when he pushed her arm through the window. Vanessa described some other incidents and told Drennan that she called the police when those incidents occurred. Drennan learned of an incident when Carl ran into the garage with the car during a domestic dispute. Vanessa also told Drennan that she believed Carl used methamphetamine. She stated that she had an Adderall prescription, but stopped taking it about

a year earlier. Vanessa alluded to not allowing Carl around the children because of his assaultive behavior. Drennan tasked Vanessa with contacting the Women's Center of East Texas.

Another intake, dated October 12, 2019, alleged severe methamphetamine use by Vanessa, that she was found passed out while being the children's main caregiver, and that she made threatening statements to Carl about harming the children. Vanessa classified the intake as "malicious" and told Drennan that random people had been calling her, she did not know who they were, and she was scared. When Drennan told Vanessa about seeing a blue vehicle in front of Vanessa's home, Vanessa began crying and stated that the vehicle belonged to Carl, she had not been home, and she was afraid. Vanessa also claimed that Carl stole her dentures. Drennan testified that Vanessa is in her thirties and that tooth loss is indicative of chronic methamphetamine use. Drennan told Vanessa that she needed to take a drug test, go stay with her mother if she was afraid, and follow up with the Women's Center. The Women's Center had told Drennan that they were unable to contact Vanessa. Drennan testified that Vanessa did not submit to drug testing, and she futilely attempted to follow up with Vanessa.

On November 15, 2019, Drennan learned about the house fire at the Arp residence and that Vanessa hired an attorney. Drennan spoke with the fire department, which could not definitively state the cause of the fire, but the fire department speculated the fire may have started because of a bucket that contained cigarette butts. Vanessa's attorney told Drennan that he filed a divorce proceeding and a protective order. Drennan told him that Vanessa needed to take a drug test. Drennan subsequently learned about the drugs found in the mailbox. She further learned that Vanessa, Carl, and the children checked into a hotel after the fire and that the police were called every night. On December 10, Drennan contacted both Vanessa and her attorney about drug testing. On January 7, 2020, after multiple attempts, Vanessa was served with court papers and Drennan again contacted her about submitting to drug testing. On January 14, Drennan learned that Vanessa tested positive for methamphetamine and amphetamine. The children tested negative.

Drennan expressed concern that the children were present during incidents between Carl and Vanessa. She testified that the 2019 police reports did not reflect that either parent was arrested. She also agreed that it is a problem if Vanessa is using methamphetamine around the children.

10

Adam Brown, a Department investigator, testified that the children were placed with their maternal grandparents. Vanessa told Brown that she used drugs "a long time ago." He unsuccessfully attempted to schedule Vanessa's visits with the children and testified that Vanessa has had no visits with the children since their removal. Brown testified that Vanessa was argumentative, telling Brown that there should have been no removal. Brown further expressed his belief that the children's current placement was appropriate.

## Analysis

To be entitled to retain possession of the children in this case, the Department was required to present evidence sufficient to satisfy a person of ordinary prudence and caution that (1) there was a danger to the children's physical health or safety, which was caused by Vanessa's acts or failures to act and for the children to remain in the home is contrary to their welfare; (2) the urgent need for protection required the children's immediate removal and reasonable efforts, consistent with the circumstances and providing for the safety of the children, were made to eliminate or prevent the children's removal; and (3) reasonable efforts have been made to enable the children to return home, but there is a substantial risk of a continuing danger if the children are returned home. *See* TEX. FAM. CODE ANN. § 262.201(g). Vanessa contends that Respondent ignored the fit parent presumption and that there is "no evidence that HSA and WSA were in any danger from remaining in the custody of the relator, no evidence that an emergency or 'immediacy' existed, and no evidence that retuning HSA and WSA to the relator created a substantial risk of continuing danger." We disagree.

First, Respondent could reasonably conclude that there existed sufficient evidence to satisfy a person of ordinary prudence and caution that there was a danger to the physical health or safety of the children, caused by Vanessa's actions or failures to act, and for the children to remain in the home is contrary to the children's welfare. The record reflects that an intake from October 2019 alleged that Vanessa was found passed out with a drug pipe nearby. The record also indicates that Vanessa avoided taking drug tests and once she did submit to testing, she tested positive for drugs just a few days before the children's removal on January 22. The Department is not expected to ignore a positive drug test. *See In re K.L.M.*, No. 14-19-00713-CV, 2019 WL 6001170, at *4 (Tex. App.—Houston [14th Dist.] Nov. 14, 2019, orig. proceeding) (mem. op.). Vanessa did not appear at the February hearing to offer any evidence that her test results were skewed by a prescription medication. *See id*. ("adversary hearing

11

affords the parents the opportunity to present evidence on their own behalf, hear and challenge the Department's evidence, and challenge the Department's right to retain the children it previously took into custody under an ex parte order"). Rather, she told Drennan that she stopped taking her prescription.

Respondent further heard testimony that Vanessa went to her home to retrieve some mail, but officers found drugs and drug paraphernalia in the mailbox. Officer Timmons noticed sores on Vanessa's face, which were consistent with methamphetamine use. Drennan testified that tooth loss is also a sign of chronic methamphetamine use, as Vanessa, being only in her thirties, alleged that Carl stole her dentures. And in fact, once Vanessa finally submitted to drug testing, she tested positive for methamphetamine, despite telling Brown that she used drugs a long time ago. Her hair follicle test revealed levels of 977 and her urine test revealed levels exceeding 10,000. Based on this evidence, Respondent could reasonably conclude that Vanessa's methamphetamine use was habitual and exposed the children to loss or injury that jeopardized their physical health or safety, i.e., her drug use could lead to her impairment or incarceration.[6] *See* TEX. FAM. CODE ANN. § 101.009 (West 2019) (danger to physical health or safety of child includes child's exposure to "loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child"); *see also In re E.R.*, No. 12-14-00171-CV, 2014 WL 6977810, at *3 (Tex. App.—Tyler Dec. 10, 2014, no pet.) (mem. op.) (parent's illegal drug use exposes child to possibility that parent may be impaired or imprisoned).

The Department likewise presented evidence demonstrating a pattern of domestic violence between Carl and Vanessa, some of which occurred in the presence of at least one of the children. Carl and Vanessa each accused the other of assault. One incident between the two resulted in the injury to Vanessa's arm, while another incident led to Carl driving through the garage door. Respondent heard evidence that despite Vanessa's claims that she was afraid of Carl, her actions reflected otherwise. For instance, although Vanessa had obtained a protective order, Carl was found in a locked bathroom in Vanessa's hotel room and Vanessa attempted to minimize that protective order by claiming that it had been dropped or was no longer valid.

---

[6] We recognize that the Fourteenth Court of Appeals appears to have rejected application of termination cases to adversary hearing proceedings. *See In re M.N.M.*, 524 S.W.3d 396, 402 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding). However, we conclude that the concepts often considered in termination cases are likewise applicable to the inquiry conducted under Section 262.201(g).

Additionally, hotel employees testified to having to call the authorities virtually every night that Carl and Vanessa stayed at their hotel. And H.A.'s actions in striking Drennan and stating, "You deserve that," when the Department came to the hotel to remove the children from Vanessa's care is indicative of learned behavior, which Respondent could reasonably conclude stems from H.A.'s observations of the abusive conflicts between his parents and statements made during those conflicts. Importantly, H.A. and W.A. are both very young and cannot protect themselves from their parents' abusive behavior towards each other. Respondent could reasonably conclude that the turmoil between Carl and Vanessa, which included some violent conduct, exposed the children to loss or injury that jeopardized their physical health or safety, i.e., such conduct exposed the children to injury and posed a risk to their well-being. *See* TEX. FAM. CODE ANN. § 101.009; *see also Interest of R.G.F.*, No. 04-20-00158-CV, 2020 WL 6293442, at *3 (Tex. App.—San Antonio Oct. 28, 2020, no pet. h.) (mem. op.) (conduct, such as parent's abusive and threatening behavior toward other parent, exposes child to injury and poses risk to well-being of child, even if past conduct did not occur in child's presence); *Interest of M.L.L.*, 573 S.W.3d 353, 361 (Tex. App.—El Paso 2019, no pet.) ("Physical violence in the home leads to an unstable and unpredictable environment for children").

Second, Respondent could reasonably conclude that sufficient evidence existed to satisfy a person of ordinary prudence and caution that an urgent need for protection required the children's immediate removal and reasonable efforts, consistent with the circumstances and providing for the safety of the children, were made to eliminate or prevent the children's removal. There exists some evidence suggesting that Vanessa threatened to crash her vehicle with the children inside and threatened to leave the children outside alone. Respondent also heard evidence that Vanessa was once found unconscious next to a drug pipe and that she uses methamphetamine; he could reasonably infer that she would likely continue doing so. As previously discussed, "[a] parent's drug use suggests instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned." *Interest of J.T.W.P.*, No. 01-18-01084, 2019 WL 2220114, at *5 (Tex. App.—Houston [1st Dist.] May 23, 2019, pet. denied) (mem. op.). Absent stability, a parent cannot provide for her children's emotional and physical needs. *See id.* (quoting *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.– Fort Worth 2003, no pet.)). Respondent could reasonably conclude that Vanessa's threats and drug use justified the children's immediate removal to protect them from loss or injury that

13

jeopardizes their physical health or safety. *See* TEX. FAM. CODE ANN. § 101.009. Respondent could reach a similar conclusion as to the tumultuous, toxic relationship between the children's parents, particularly given evidence of Vanessa's reluctance to completely separate herself from Carl. *See R.G.F.*, 2020 WL 6293442, at *3; *see also M.L.L.*, 573 S.W.3d at 361. The pattern of abusive behavior between Vanessa and Carl appears to have been ongoing and possibly escalating given claims that hotel employees contacted police virtually every night that the Arps stayed at the hotel, as a result of the disputes between the spouses.

Moreover, the record indicates that the Department received two intakes that predate removal, dating back to September 2019, but the children were not removed from Vanessa's care until January 2020. Drennan's testimony indicates that she repeatedly asked Vanessa to submit to drug testing, but Vanessa failed to do so, and Drennan attempted to remain in regular contact with Vanessa. Additionally, Drennan referred Vanessa to the East Texas Women's Center for assistance with seeking a protective order and when speaking to Vanessa's counsel, requested that Vanessa be drug tested in order to close the case if the domestic violence issue would be handled through the divorce. Thus, the record contains evidence from which Respondent could reasonably conclude that the Department made reasonable efforts to prevent the children's removal from Vanessa's care.

Third, Respondent could reasonably conclude that sufficient evidence existed to satisfy a person of ordinary prudence and caution that the Department made reasonable efforts to return the children to their home, but there existed a substantial risk of a continuing danger if they returned home. Although the record does not demonstrate implementation of a service plan for Vanessa, the Department arranged for the children's placement with their maternal grandparents and attempted to schedule visitation between Vanessa and the children, to no avail. *See In re R.P.D.*, No. 05-19-00258-CV, 2019 WL 1578274, at *2 (Tex. App.—Dallas Apr. 12, 2019, no pet.) (evidence of reasonable efforts included service plan, visitation, and home study of maternal grandparents). Brown testified to the suitability of the children's placement with their grandparents. Moreover, at the conclusion of the hearing, Respondent ordered that the Department create a family service plan for Vanessa. The record simply does not support a conclusion that the Department took no reasonable efforts to return the children to Vanessa. And due to evidence demonstrating chronic drug use by Vanessa and her continued association with Carl, who she accused of assaultive behavior and who accused her of assaultive behavior, despite

14

the protective order, could lead Respondent to reasonably conclude that there existed a substantial risk of a continuing danger to the children if returned home, namely, exposure to loss or injury that jeopardized their physical health or safety. *See* TEX. FAM. CODE ANN. § 101.009.

In a mandamus review, our sole inquiry is whether Respondent abused his discretion. With respect to resolution of factual issues or matters committed to Respondent's discretion, we may not substitute our judgment for that of Respondent. *See* ***Walker v. Packer***, 827 S.W.2d 833, 839 (Tex. 1992). "Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." ***Id***. at 840. Such is not the case here. Rather, based on the evidence presented at the February 18 adversary hearing, at which Vanessa failed to appear and contest the Department's evidence, we cannot conclude that Respondent abused his discretion by signing the March 3 order and declining to return the children to Vanessa's custody.[7]

## MOTION TO DISMISS

Vanessa argues that Respondent abused his discretion by denying her motion to dismiss, in which she alleged that fraud was committed during the testimony of Officer Timmons, Officer Davis, Officer Howell, and Drennan. She further alleges that Drennan used fraud to procure the children's removal. We conclude that Respondent's ruling is not reviewable via mandamus under the circumstances of this case.

In certain circumstances, incidental trial court rulings can be corrected by writ of mandamus. ***In re Entergy Corp.***, 142 S.W.3d 316, 321 (Tex. 2004). However, mandamus relief from a non-appealable interlocutory order requires the showing of a serious denial of a right for which the remedy by appeal is inadequate. ***In re East Tex. Med. Ctr.***, No. 12-17-00183-CV, 2017 WL 4675511, at *2 (Tex. App.—Tyler Oct. 18, 2017, orig. proceeding) (mem. op.). "The operative word, 'adequate', has no comprehensive definition; it is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts." ***In re Prudential Ins. Co. of Am.***, 148 S.W.3d 124, 136 (Tex. 2004). "An appellate remedy is 'adequate' when any benefits to mandamus review are outweighed by the detriments." ***Id***. If the benefits outweigh the

---

[7] This opinion should not be construed as a determination regarding the sufficiency of the evidence to support termination of Vanessa's parental rights.

detriments, an appellate court must consider whether the appellate remedy is adequate. *Id.* This determination is not an abstract or formulaic one; it is practical and prudential. *Id.* Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. *Id.*

"Mandamus review of incidental, interlocutory rulings by the trial courts unduly interferes with trial court proceedings, distracts appellate court attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and adds unproductively to the expense and delay of civil litigation." *Id.* "As a selective procedure, mandamus can correct clear errors in exceptional cases and afford appropriate guidance to the law without the disruption and burden of interlocutory appeal." *Id.* at 138. We must be mindful that the benefits of mandamus review are easily lost by overuse. *Id.* An appellate court will exercise jurisdiction not merely because inaction would cause hardship to the parties, but because special, unique circumstances mandate the appellate court's intervention. *See In re Entergy Corp.*, 142 S.W.3d at 321.

The "denial of a motion to dismiss is usually not susceptible to mandamus relief." *In re Gibson*, 533 S.W.3d 916, 919 (Tex. App.—Texarkana 2017, orig. proceeding). This is because such a denial is a ruling incident to the ordinary trial process and will not be corrected by mandamus, but by the legal remedy of the ordinary appellate process. *Id.* at 920 (quoting *Hooks v. Fourth Court of Appeals*, 808 S.W.2d 56, 59 (Tex. 1991) (orig. proceeding)). Although this case involves the denial of a right, i.e., parental rights, we note that Vanessa had an opportunity to appear at the February 18 hearing and object to the testimony offered by the witnesses of which she now complains, yet she failed to appear at that hearing. Moreover, we have already conducted mandamus review of the temporary order based on that testimony; thus, this is not a situation in which Vanessa has no recourse available to her. Additionally, Respondent's denial of Vanessa's motion to dismiss does not preclude her from developing the merits of her case at trial. And there is no indication that any error stemming from that denial could not be made a part of the appellate record or cured via appeal after final judgment. *See Interest of C.M.J.*, 573 S.W.3d 404, 408-09 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)

16

(addressing denial of motion to dismiss on appeal from decree terminating parental rights). Nor is there any suggestion in the record that mandamus review is essential to give needed and helpful direction that would otherwise prove elusive in an appeal from the denial of the motion to dismiss on appeal after final judgment. Accordingly, we conclude that the denial of Vanessa's motion to dismiss is not subject to mandamus review.

## PLACEMENT CHANGE

Vanessa maintains that Respondent abused his discretion by denying her motions for placement change, in which she sought a monitored return of the children.

### Applicable Law

Notwithstanding Section 263.401 of the family code, which addresses dismissal after one year, a court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that:

> (1) finds that retaining jurisdiction under this section is in the best interest of the child;
> (2) orders the department to:
>     (A) return the child to the child's parent; or
>     (B) transition the child, according to a schedule determined by the department or court, from substitute care to the parent while the parent completes the remaining requirements imposed under a service plan and specified in the temporary order that are necessary for the child's return;
> (3) orders the department to continue to serve as temporary managing conservator of the child; and
> (4) orders the department to monitor the child's placement to ensure that the child is in a safe environment.

TEX. FAM. CODE ANN. §§ 263.401, 263.403(a) (West 2019 & Supp. 2020).

### Analysis

Assuming, without deciding, that mandamus review is available for the denial of Vanessa's motions for placement change, we conclude that Respondent did not abuse his discretion by denying the motions.

Respondent held two placement change hearings. At a hearing on June 23, 2020, caseworker Monica Writt testified to her concern that Vanessa committed abuse in accordance with Section 261.001(1)(A)-(D) of the family code.[8] Writt explained that H.A. witnessed

---

[8] "Abuse" includes the following acts or omissions: (A) mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning; (B) causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning;

17

domestic violence and his parents using drugs, and has a lot of trauma that affects him in school, at home, and with his sister and other females. A CANS assessment revealed that he is guarded, afraid, and has relationship issues with females.[9] She testified that H.A. does not know how to cope or channel his anger, and it is believed that this results from what he witnessed at home. According to Writt, H.A. is smart and verbalizes when he wants to see his counselor because of remembering a violent incident between his parents. She testified that the trauma from the removal is being addressed in counseling, which would help him redirect his feelings and work through it. She "absolutely" believed that returning H.A. to Vanessa would cause more trauma than the removal. She explained that Vanessa has a positive drug test from the time of removal and has presumed positives from tests she was ordered to take but did not take, Vanessa had not reviewed or signed her service plan or begun services, her attempts to contact Vanessa were unsuccessful, and she did not know if Vanessa's home is safe or hazard free because she did not know Vanessa's address, Vanessa did not contact the Department, and she has not seen Vanessa's home. Writt stated that the Department's concerns at the time of removal remained. She believed it was in the children's best interest that they continue receiving services from the Department, such as counseling, therapy, and psychological assessments, and she did not believe they would receive these services if with Vanessa.

Vanessa testified that her divorce was finalized on January 21 and the rebuild of her home was scheduled to be completed by the end of June or beginning of July. She had been residing in an apartment and works as a hair stylist. She took additional drug tests, which were negative. She denied placing the children in a position to witness violence or to be traumatized. She testified to contacting the police about Carl, obtaining a protective order, and going to the Women's Center. Vanessa admitted never signing a safety or family plan. She acknowledged that at a previous hearing, Writt attempted to provide her service plan but Vanessa replied, "No ma'am. No thank you." Although willing to review a plan, Vanessa testified, "Like I stated at the last hearing, and like I'll continue to state, I do not believe that services are needed for

---

(C) physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident or reasonable discipline by a parent, guardian, or managing or possessory conservator that does not expose the child to a substantial risk of harm; [or] (D) failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child. TEX. FAM. CODE ANN. § 261.001(1)(A)-(D) (West 2020).

[9] CANS is an abbreviation for "Child and Adolescent Needs and Strengths."

myself." When asked if she would allow Writt inside her home, Vanessa testified, "As I stated, I do not feel like services are necessary, and I did not sign a family plan." She expressed willingness to take a drug test at a specific location the afternoon of the hearing. She had not sought counseling but was not opposed to it. She denied still seeing Carl, including since his last violation of the protective order and since she moved into her apartment. She acknowledged making mistakes and not being without fault but denied doing anything that caused the children to be placed with her parents.

Sedelia Nelson, an investigator with the Gregg County Criminal District Attorney's Office, testified that she arrested Carl for violation of the protective order and, on several occasions, saw him entering the apartment complex where Vanessa resides. She admitted to jiggling the handle to Vanessa's apartment door to see if the door was unlocked.

At the conclusion of the hearing, Respondent granted Vanessa two hours per week visitation, to be supervised by Department representatives at the Department. But Respondent expressed a willingness to modify this ruling, provided that the Department was allowed to visit Vanessa's apartment and Vanessa tested negative for drugs. Respondent explained that he would not place the children with Vanessa because he did not know what had been going on with her for the last six months or whether her test would be positive or negative, nothing was known about her living arrangements, she had not worked services, remained in contact with the Department, or appeared at all hearings, and neither he nor the Department has been able to monitor Vanessa.

At a hearing on September 30, Vanessa testified to the best interest factors enumerated in Section 263.307 of the family code and, in doing so, maintained that (1) the children are at vital stages in their mental and emotional development and should be allowed the security of being with a parent, as being taken from their parents will cause lifelong damage, (2) until their removal, the children had never been away from their parents but had been completely cut off from their parents for several months, with the exception of two hours weekly supervised visitation, (3) she caused no harm to the children; the only harm they suffered is due to the Department's removal, (4) the children received no repeated harm by her since removal, (5) the children are not afraid to return home, (6) the children's psychological assessments did not reveal anything that would necessitate their continued removal, (7) there is no history of abusive or assaultive conduct between herself and the children, (8) she has not been identified as a

19

perpetrator of harm to the children, (9) she has had home visits with Writt, who had no concerns about the home, (10) she affected a positive environment for the children, (11) Writt had no concerns regarding her visits with the children and she completed a parenting class in 2017.[10] She testified that H.A. was "suffering greatly" from the removal and wanted to return home. Although she sees a counselor weekly, she had not begun the Healthcore program ordered by the court. She testified to drug testing whenever requested by Writt. She had an appointment for a psychological evaluation and was prepared to begin parenting and drug counseling classes in the coming weeks. She had not yet scheduled a drug assessment because she believed they were not being done due to the pandemic. Regarding the children's current placement, Vanessa testified that H.A. is terrified, his behavior changed drastically, he is desperate to return home, and he cries whenever he sees Vanessa. She explained that he cannot concentrate and is unable to listen. She believed he benefitted from counseling and expressed willingness to continue taking him to appointments.

Respondent noted that Vanessa had several tasks scheduled but had not completed any of those tasks as set forth in the service plan. Accordingly, Respondent declined to order a monitored return at that juncture of the proceedings. Respondent explained, "I will go back to the reasons that they were originally removed that dealt with family violence in the home, domestic violence in the home, a positive drug test on your part, which is consistent with evidence that there was a drug pipe found in your mailbox, evidence of one of your children, at least one of your children, witnessing domestic violence in the home…. I need to know that those things are not going to happen again before I can just haul off and let the children come back to you." He specifically pointed to Vanessa's failure to take a parenting course and complete a drug assessment so that Respondent could know whether she has a drug problem, and the lack of counseling records because she chose to counsel with someone other than a person appointed by the court or through the Department. Respondent stated that "all those things make me uncomfortable about returning the children to your care at this time without having more evidence regarding those matters. And so, that being the case, I don't think that it's in the best interest for your children to be coming home to you right now. If I have some additional

---

[10] *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019).

information with regard to eliminating the very reasons that the children were removed, I might have a different attitude, but I don't have that."

After these comments, Respondent allowed Writt to testify. Writt stated that she had no concerns regarding Vanessa's visits with the children but she did have concerns about the children being placed with Vanessa given her failure to complete a therapeutic parenting course. Based on Vanessa's interaction with the children, she had no concerns as to how Vanessa parents the children or their safety. Nor did she observe any hazardous or safety concerns at Vanessa's home. She acknowledged that the children are attached to Vanessa, the Department's involvement is traumatizing, and counseling is beneficial to H.A. She believed that the facts of the removal and what H.A. had seen throughout his life affected H.A. She recalled H.A. saying he wanted to come home and that he misses Vanessa, but she did not recall him saying that he was afraid. She sensed that he may be confused or still adjusting and the visits trigger the trauma. She acknowledged that H.A. has some behavioral issues but she could not say that he is worse than before, although he is more vocal.

Respondent then expressed to Vanessa that it appears her home is appropriate and the children are attached to her; however, Respondent noted that the children were removed on January 22, Vanessa's first two hearings were rescheduled at her request, she did not appear at the February 18 or March 11 hearings, and she finally appeared at a hearing on May 29. Respondent stated the following:

> …So, from January the 22nd to May the 29th, these children being out of your care, you never one time came to this Court to try to do anything about that, and you never worked a single solitary service that would lead you to the road to getting these children back.
>
> So, it's a little bit disingenuous in this Court's opinion for you to come in here today really in June of this year, some six -- really in July or August of this year, six, seven months down the road, starting to work services, and then being upset because the Court's not going to return these children to you when you've had plenty of time that you didn't take advantage of.
>
> …
>
> …It is my preference to return children to their parents. And if can do so in a safe manner that's in their best interest, I am going to do it.
>
> But that requires some efforts on your part to do what the Court has ordered you to do. And the fact that you're just starting to do that in August as opposed to February or March is not this Court's fault. That's on you.

Respondent denied the request for a placement change.

21

"It is well established Texas law that an appellate court may not deal with disputed areas of fact in an original mandamus proceeding." *In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (orig. proceeding) (quoting *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex. 1990) (orig. proceeding)). "If the record contains legally sufficient evidence both against and in support of the trial court's decision, then mandamus will not lie because weighing conflicting evidence is a trial court function." *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 686 (Tex. 2007) (orig. proceeding) (Johnson, J., dissenting); *see also In re Walton*, No. 11-16-00230-CV, 2017 WL 922418, at *1 (Tex. App.—Eastland Feb.28, 2017, orig. proceeding) (mem. op.). It is within the province of the trial court to resolve matters regarding witness credibility and the weight to be assigned the evidence. *See Walton*, 2017 WL 922418, at *2; *In re M.C.W.*, 401 S.W.3d 906, 907 (Tex. App.—Amarillo 2013, orig. proceeding). The record contains some evidence from which Respondent could reasonably conclude that it was not in the children's best interest to be returned to Vanessa, given the continued concerns regarding substance abuse and potential domestic violence, along with her failures to complete tasks identified in her service plan. Because some legally sufficient evidence supports Respondent's decision, we cannot say that Respondent abused his discretion by denying Vanessa's motions for placement change. *See Walton*, 2017 WL 922418, at *1-2 (denying mandamus petition where record contained "evidence that a rational factfinder could interpret as satisfying the statutory requirements to the effect that the temporary orders were necessary because the children's present circumstances would significantly impair the children's physical health or emotional development").

## DISPOSITION

Having determined that Vanessa failed to show her entitlement to mandamus relief, we *deny* her petition for writ of mandamus.[11] All pending motions are *overruled as moot*.

GREG NEELEY
Justice

Opinion delivered January 13, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

---

[11] In her petition and reply brief, Vanessa lists numerous rulings that she contends were not proper. We do not address those complaints that are not fully briefed. *See* TEX. R. APP. P. 38.1(i) (brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and the record); *see also Muhammed v. Plains Pipeline, L.P.*, No. 12-16-00189-CV, 2017 WL 2665180, at *2 n.3 (Tex. App.—Tyler June 21, 2017, no pet.) (mem. op.) (a pro se litigant is held to same standards as licensed attorneys and must comply with all applicable rules of procedure).

22



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 13, 2021**

**NO. 12-20-00251-CV**

**VANESSA ARP,**
Relator
V.

**HON. TIM WOMACK,**
Respondent

## ORIGINAL PROCEEDING

ON THIS DAY came to be heard the petition for writ of mandamus filed by Vanessa Arp; who is the relator in appellate cause number 12-20-00251-CV and a party in trial court cause number 2020-151-DR, pending on the docket of the 307th Judicial District Court of Gregg County, Texas. Said petition for writ of mandamus having been filed herein on November 4, 2020, and the same having been duly considered, because it is the opinion of this Court that the writ should not issue, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby **denied**.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*