**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-22-00108-CV**

**IN THE INTEREST OF B.N.**

**On Appeal from the 279th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-238,711**

## MEMORANDUM OPINION

Mother and Father both appeal from an order terminating their parental rights.[1] After a bench trial, the trial court found, by clear and convincing evidence, that statutory grounds exist for termination of Mother's parental rights to her minor child "Billy," and that termination of Mother's parental rights would be in the best interest of Billy. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (F) (N), (O), (2). The trial court also found, by clear and convincing evidence, that statutory grounds exist

---

[1] We refer to the appellants as "Mother" and "Father" and the child by a pseudonym to protect their identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

1

for termination of Father's parental rights to his minor child Billy, and that termination of Father's parental rights would be in the best interest of Billy. *See id.* § 161.001(b)(1)(F), (N), (O), (2). After review, we affirm the trial court's judgment terminating Mother's and Father's parental rights.

## FATHER'S APPEAL

Father's appointed counsel submitted a brief in which counsel contends that there are no arguable grounds to be advanced on appeal. *See Anders v. California*, 386 U.S. 738 (1967); *In re L.D.T.*, 161 S.W.3d 728, 731 (Tex. App.—Beaumont 2005, no pet.). The brief provides counsel's professional evaluation of the record. Counsel served Father with a copy of the *Anders* brief filed on his behalf. This Court notified Father of his right to file a pro se response, as well as the deadline for doing so. This Court did not receive a pro se response from Father.

We have independently reviewed the appellate record and counsel's brief, and we agree that any appeal would be frivolous. We find no arguable error requiring us to order appointment of new counsel to re-brief Father's appeal. *Cf. Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). We affirm the trial court's judgment terminating Father's parental rights to Billy.

We deny the motion to withdraw filed by Father's court-appointed counsel because an attorney's duty extends throughout the exhaustion or waiver of all appeals. *See* Tex. Fam. Code Ann. § 107.016(2)(B); *In re P.M.*, 520 S.W.3d 24, 27

2

(Tex. 2016). Should Father decide to pursue an appeal to the Supreme Court of Texas, counsel's obligations to Father can be met "by filing a petition for review that satisfies the standards for an *Anders* brief." *See In re P.M.*, 520 S.W.3d at 27-28.

## MOTHER'S APPEAL

Mother's appointed counsel filed a merits brief and in four issues questions whether the evidence was legally or factually sufficient to support the trial court's judgment terminating the parental rights of Mother to the child on each statutory ground found by the trial court, as well as in the child's best interest. It is the burden of the Department to show by clear and convincing evidence that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2).

### I. Background

**Pretrial Allegations**

On January 27, 2021, the Department received a referral alleging mental health concerns regarding Mother. According to the affidavit submitted by the Department to the trial court and attached to its Original Petition for Protection of a Child, For Conservatorship, and For Termination in Suit Affecting the Parent-Child Relationship, Mother, while still in the hospital after giving birth to Billy, was "trying to give her child away."[2] Mother was accused of taking a photo of her child

---

[2] The affidavit was admitted as evidence at trial.

and texting the photo of the child to someone asking whether that person wanted the child. The message contained a photo of Billy and stated, "Do you want the baby. It's a boy. Your mom…say you wanted a baby boy." The affidavit stated that Mother also had failed to fill out any vital statistics registry documents at the hospital for her child.

When the Department interviewed Mother, she denied having mental health or medical issues. She also denied sending a photo of Billy and trying to give him away. Mother told the Department she wanted to keep and care for her child. But, Mother could not provide the Department with a home address or proof that she had any essentials to provide for an infant child.

The Department eventually was able to obtain an address where Mother was living temporarily, and determined the home did not have any necessities for a newborn child. Another member of the household confirmed that Mother was to stay at the home, and also stated that Mother did not have any necessities for her child. The Department alleged in its affidavit that it had serious safety concerns for the child and concerns for Mother's mental health and ability to care for her child, a lack of a stable home, and that Mother was trying to give her child away to a stranger. The affidavit also stated that Mother had a prior history with the Department, having previously lost parental rights to two other children.

4

**Evidence at Trial**

On March 29, 2022, the trial court conducted a bench trial. Department caseworker Stephanie McGlory testified that she was the caseworker on this case from July 2021 to January 2022. According to McGlory, Mother blamed Father's ex-girlfriend for calling the Department and making the allegation that Mother could not take care of her child. She explained the Department's concerns regarding Mother's mental health, her history with the Department, including allegations of sexual abuse of her older children, and her lack of a stable home. Mother's family service plan was created to address these concerns. In Mother's service plan, she was required, among other things, to get a psychological assessment. McGlory stated the Department provided the information for Mother to contact the doctor. McGlory testified she has never had a case where a parent has not been able to contact the mental health doctor, testifying it is very easy to get in touch with the doctor. She believed that the Department gave Mother "reasonable time" to complete her service plan and she agreed she would have done anything possible to help Mother complete her services. She stressed that while English was not Mother's native language, there was not a language barrier impairing Mother's completion of her family service plan, because although Mother would need a translator to speak to the doctor and her office, the Department provided those services. McGlory also noted that Mother normally brought someone with her to translate for her. McGlory testified that

Mother only contacted the doctor two days before trial, which did not allow sufficient time for the Department to arrange an interpreter for her. Additionally, McGlory stated that Mother had only completed a parenting class and gone to Spindletop for a mental health assessment toward completing her family service plan. She explained that this case started in January 2021 and Mother waited until November 2021 to contact the mental health doctor, two days before the trial was originally scheduled to begin. McGlory believed that Mother made only a "last-ditch effort" to complete her plan to try to keep her child and that Mother would not be a capable or protective parent if Billy were returned to her. During cross-examination, McGlory agreed that the classes Mother needed to take were not offered in her native language of Vietnamese and Mother therefore would not be to blame if she did not fully comprehend, engage in, or understand the class. She also agreed that Mother's language barrier, the pandemic, and caseworker turnover could have created barriers for Mother to successfully complete her service plan.

McGlory testified that she visited Mother's home in July 2021. She stated it was a one-bedroom apartment with "really no furniture." She took pictures of the apartment and the pictures were admitted at trial. McGlory stated that the bedroom had a nightstand, a very little storage container, with only blankets on the floor and no mattress. In the living room, there was no furniture except for a rug. The apartment contained no items for a newborn baby, and when confronted with this

6

information, Mother stated she was going to get those things, but provided no timelines of when she would obtain the necessary items.

McGlory observed all of Mother's visitations and described the visitations between Mother and Billy as "not of good quality." She stated that Mother would call while she was working on a client at her nail salon or while she was driving. She described Mother's virtual visits as follows:

> Most of the time mom was working and she would put the phone in a drawer and what you could see was maybe her client's feet, but you couldn't see her face. There were several visits where mom was driving while visiting. There was a visit where mom fell asleep. There was a visit with mom was cooking. So, as far as her engaging or having – at least having her face, you know, in the framework for the kid to see, they were not of good quality.
>
> . . . .
>
> And when I say that, I mean if you're going to have a virtual visit with your kid, be on the phone. Let your face be on the phone. Let the child at least -- let the child at least familiarize yourself with the face because it's a little kid. Yes, he's moving around. His attention span is short, but you can't have somebody's feet on your phone while you're visiting with your kid.

McGlory stated she could have rescheduled visitations between Mother and her child to a time when Mother was not working, if Mother had requested her to do so.

Foster Mother testified she is the foster parent of Billy and has been since January 2021. She testified that she would like to adopt Billy if the parents' rights were terminated. Foster Mother testified that other than being slightly anemic, Billy did not have any developmental delays. Foster Mother stated she has tried to

7

facilitate visitations with Mother since Billy has resided with her. According to Foster Mother, the initial virtual visits between Mother and Billy would last an hour only because Mother would be working on her client's feet and have the phone in a drawer. She confirmed that Mother also would be driving at times when she had virtual visitation with Billy. After Billy turned one, Mother transitioned to in-person visits, but Billy would cry at every visit when he saw Mother. Foster Mother testified that Mother attempted to interact with Billy while at the courthouse and Billy "started crying and wanted - - I was holding him when she came up, and then [Billy] leaned for my husband to take him." Mother would say to Billy "[g]o back to your mama[,]" referring to Foster Mother. Foster Mother found this behavior "strange[.]" Foster Mother agreed that if Mother had shown her face during the virtual visitations, she could have fostered a better relationship with Billy. Foster Mother stated that if she had only one hour of visitation with her child each week, she would not do what Mother did during her visitation periods. In regard to Mother's support of her child during the pendency of the case, Foster Mother testified Mother provided a box of diapers twice a week since his first birthday, a box of 1 percent milk that Billy could not drink, and clothes that were several sizes too big. Foster Mother did not believe that there was a substantial language barrier problem, noting Mother generally initiated conversations when she was around Foster Mother.

Mother testified with the aid of an interpreter at trial. Mother stated that she did not know why the Department became involved, only that "[the Department] took the baby away from me." Mother denied that she tried to give away or sell her baby when he was born, asserting that she did not send the text messages about Billy and did not know the phone number in that message.[3]

Mother testified that her other children were removed in "2015 or '16" due to a man sexually assaulting them. Mother testified through an interpreter that she either relinquished her rights to the children or her rights were terminated after she moved out of state. Appellant's brief explained that the termination or relinquishment resulted after Mother allowed the accused molester to have contact with the children, in violation of a plan of safety for the children.

Mother testified that she understood the family service plan was created for her to work and acknowledged that she was not in compliance with its terms. As for the remaining uncompleted part of her family service plan, Mother stated that she

---

[3] Under the "Danger/Worry Statements:" of Mother's family service plan admitted at trial, the Department provided the following assessment,

> The Department of Family and Protective Services has concerns of [Mother's] ability to keep [Billy's] safety at top priority. The Department of Family and Protective Services has concerns that [Mother] does not have stable housing that will meet her needs and the needs of [Billy]. The Department of Family and Protective Services has concerns of [Mother's] financial means that will meet her needs and the needs of her children. The agency has concerns [Mother] was attempting to sell [Billy]. [Mother] does not have custody of her other 3 children.

tried to get her psychological assessment as required under the family service plan, but she could not get through to the doctor. Mother also admitted she did not financially support Billy as required by the plan, but stated that she brought items each time she visited with Billy. Mother confirmed that she is employed at a nail salon; she provided check stubs, filled out the "Health, Social, Education and Genetic History form[,]" notified the agency of lifestyle changes, maintained contact with the Department caseworker, and completed her mental health assessment as required by the family service plan. No mental health concerns were noted for Mother, and she stated the mental health assessment told her "I didn't need [to] come back." She explained that she sometimes has difficulty communicating because of the language barrier and needs a friend to interpret for her. When questioned about baby supplies for Billy, Mother stated that she had baby supplies, but they were not at the house where she was staying, but at another home.

At the conclusion of trial, the trial court found there was sufficient evidence to terminate Mother's parent-child relationship under predicate grounds (E), (F), (N), and (O) of the Texas Family Code and that it is in the best interest of Billy that Mother's rights be terminated. Tex. Fam. Code Ann. § 161.001(b)(1) (E), (F), (N), (O), (2). The trial court also signed Findings of Facts and Conclusions of Law reiterating the same findings set forth in the termination order.

## II. Standard of Review

In five issues, Mother challenges the legal and factual sufficiency of the evidence supporting the best-interest finding and the termination grounds specified in sections 161.001(b)(1)(E), (F), (N) and (O). *See id.*

Under a legal sufficiency review, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

Under a factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We give due consideration to evidence that the factfinder reasonably could have found to be clear and convincing. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its ruling. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in

11

favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

The decision to terminate parental rights must be supported by clear and convincing evidence, i.e., "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best-interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C., Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.). However, when, as here, a parent challenges a trial court's findings under section 161.001(b)(1)(D) or (E), we must review the sufficiency of those grounds as a matter of due process and due course of law. *See In re N.G.,* 577 S.W.3d 230, 235 (Tex. 2019).

## III.  Analysis

**Mother's First Issue**

In her first issue on appeal, Mother challenges the sufficiency of the evidence under the predicate finding of subsection (E) of the trial court's order. Tex. Fam. Code Ann. § 161.001(b)(1)(E). For purposes of subsection (E), endangerment means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *In re M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.). Termination under subsection (E) requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re M.L.L.*, 573 S.W.3d at 363-64. A parent's conduct that subjects a child's life to instability and uncertainty endangers the emotional or physical well-being of a child. *Id.* at 363. Endangerment is not limited to actions directed toward the child and includes the parent's actions before the child's birth and while the parent had custody of older children. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Finally, "[i]n determining whether a parent endangered the child's physical and emotional well-being due to mental instability, the factfinder may consider evidence of a parent's failure to comply with services to improve her mental health." *In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op); *see also In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *4 (Tex. App.—Fort Worth Feb. 18, 2022, no pet.) (mem. op.) (listing various cases "recognizing that the trial court could

13

'consider [the mother's] failure to complete [the] service plan as part of its endangering-conduct analysis'").

The record demonstrates that Billy was in his Mother's care for two days after he was born in the hospital. Mother did not fill out any vital statistics paperwork for Billy after his birth and while at the hospital. An investigation of her home demonstrated that she did not have any necessary supplies to care for a newborn. Evidence was also admitted that someone sent a text message with a picture of Billy offering to give him away or sell him as termed by the Department in Mother's family service plan. After Billy's removal, Mother continued to demonstrate that she was not equipped to care for a young child. A visit to her new home did not show any baby items and very sparse furniture. The person with whom she was going to reside did not know her very well but confirmed Mother did not have anything in the residence for a newborn. Although Mother stated she would get the supplies, she provided no timeline as to when she would obtain such supplies. A trial court may reasonably infer from her actions and inactions that Mother did not exhibit proper parenting skills or abilities.

Mother continued to exhibit the lack of any parental bond with Billy as she would be working during virtual visitations with her child, leaving the phone face up in a drawer while she worked on a client's feet. Foster mother testified that when Mother began in person visitation with Billy, he would cry at every visit. On one

14

occasion, Mother handed Billy back to the foster family and told the child to go back to "mama[,]" referring to the foster mother. Mother provided very little care to her child, not heeding the request of the foster parent about appropriately sized clothing or correct milk, and provided no financial support. Mother had two children previously removed from her care due to allegations of endangering them by allowing their accused sexual molester access to the children in violation of a court-ordered plan of safety. Mother lost her parental rights to those two children as a result of her conduct. Finally, Mother failed to complete her family service plan and some efforts to complete the family service plan were made only at the last minute before trial.

From the record evidence as a whole, we conclude the trial court could have formed a firm belief or conviction that terminating Mother's parental rights to Billy was proper under subsections E. *See In re J.F.C.*, 96 S.W.3d at 264-66; *see also In re J.F.-G.*, 612 S.W.3d 373, 384 (Tex. App.—Waco 2020, aff'd, 627 S.W.3d 304 (Tex. 2021)) (considering the parent's past behavior in determining whether the child would be placed in a situation that endangered her physical and mental wellbeing under subsection E*); In re A.R.F.*, No. 02-13-00086-CV, 2013 WL 3874769, at **16-20 (Tex. App.—Fort Worth July 25, 2013, no pet.) (mem. op.) (considering a parent's history with the Department, among other issues, for endangerment finding under subsection E). As the sole factfinder, the trial court

reasonably could find that Mother's history with the Department; attempts to give away her child at birth; lack of preparedness for a newborn and later a toddler in her home; along with her failure to form a proper parental bond with Billy through visitations and interactions with the child; and failure to complete her service plan placed her child in circumstances that exposed the child to an unreasonable risk of harm to both his emotional and physical health. Tex. Fam. Code Ann. § 161.001(b)(1)(E). We overrule Mother's first issue.[4]

**Mother's Fifth Issue**

In her fifth issue, Mother contends the evidence is legally and factually insufficient to support the trial court's best-interest finding. Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest. Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with his or her parent). Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is ... in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). When determining whether terminating the parent-

---

[4] Due to our resolution of this issue, it is not necessary to address Mother's second, third or fourth issues as it would afford her no greater relief on appeal. *See In re N.G.,* 577 S.W.3d 230, 235 (Tex. 2019); *see also* Tex. R. App. P. 47.1.

child relationship is in the child's best interest, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*.[5]

In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Often, the evidence that supports the predicate findings on the D and E grounds may also support the trial court's best-interest finding. *In re T.R.S.*, No. 09-18-00482-CV, 2019 WL 2455273, at *5 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.) ("The same evidence that supports a trial court's findings under subsections D, E, … may also be relevant to the trial court's best-interest finding."). And the Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that

---

[5] In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the party seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). "This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Id*.

terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding. *Id.* at 28.

Evidence at trial established that Mother was not prepared to care for a newborn at her home when Billy was born, and despite moving to a different place of residence during the pendency of the trial, issues remained regarding her preparedness for having a newborn child living with her at the home. Testimony showed that Mother lived in a sparsely furnished one-bedroom apartment, with no items for her child, although Mother testified that she was going to get items for her child, she did not state when she planned to obtain the necessary items. And while there was testimony that Mother was gainfully employed, there was no evidence presented that she had subsequently purchased any necessary items to care for the child by the time of trial. Additionally, evidence was presented that Mother never intended to have Billy in her home, because she attempted to give away or sell him at the hospital, as shown by a text message sent from her phone, although Mother denied these allegations.

While there was testimony that Mother completed a portion of her family service plan, there was also testimony that she waited until two days before trial to

contact a doctor regarding her psychological assessment, and attended parenting classes without the aid of a translator. The trial court noted this in an oral ruling, stating,

> [THE COURT]: [L]ook, the language problem is not any part of my decision. Wait, let me try to rephrase that better. I'm not holding it against you because you are struggling with the language. And I realize that you may have had problems with some of the classes because they were not in Vietnamese but -- and I would have been willing to help you with those classes, but I would have needed to know that there was a problem. And if you did see a problem, I think at least you could have helped the situation by bringing someone to help translate for you. The -- at the hearings I have to warn the parents that …. -- that in addition to doing the -- attending the classes, you have to demonstrate that you learned something from the class. And I don't -- and I have not seen that you two have demonstrated to me the -- that you can do what would be expected.

While Mother was present for the virtual visitations with her child, she made no effort to form the proper parental bond with the child. She would often place the phone down and work on clients' feet instead of interacting with Billy, or call while she was driving, even though the Department confirmed they could have scheduled visitation during times when she was not working. Additionally, testimony demonstrated that when Mother transitioned to in-person visitations, Billy would cry when he saw Mother. Mother also had a history of endangering her children, having lost her parental rights to two older children after she allowed their accused molester to have access to the children in violation of a court order to preclude any contact with the accused.

Finally, there was no testimony or evidence presented as to Mother's plans for Billy if he were returned to her care. She did not address whether her home was properly furnished for a child, if she had proper food or supplies, and what her child care situation would be while she worked. Mother had rarely provided any necessities for her child and if she did, such supplies were at times inappropriate for his age. Foster Mother testified that she tried to facilitate visitations between Mother and Billy over video calls, but that Mother frequently worked while she was supposed to be visiting and bonding with her child. Foster mother also stated that although Mother began in-person visitations prior to trial, Billy would become upset during those visitations. During one visitation, Billy became fussy, and Mother handed him back to the foster family stating go see your "mama." Foster Mother testified that she has had Billy since he was born in January 2021, almost the entirety of his life, and wanted to adopt Billy if Mother's rights were terminated. We find the evidence both legally and factually sufficient for the trial court to have found by clear and convincing evidence that it was in Billy's best interest to terminate Mother's parental rights to the child. We overrule Mother's final issue.

## IV. Conclusion

Having concluded the evidence was legally and factually sufficient to support the trial court's judgment, we affirm the trial court's judgment terminating Mother's parental rights to Billy.

20

AFFIRMED.

 

_____
CHARLES KREGER
Justice

Submitted on July 27, 2022
Opinion Delivered September 29, 2022

Before Kreger, Horton and Johnson, JJ.

21